Richard S. Heller, J.
This claim arises from the permanent appropriation of about 35 acres of land by the State pursuant to sections 307 and 355 of the Education Law. The title to the property vested in the State on October 11, 1954 and service on the claimant by filing in the Broome County Clerk’s office -in accordance with the statute was completed on May 13, 1955. The claim was filed on September 22, 1955.
The claimant and the State agree that claimant is entitled to recover for that which the State appropriated. The claimant and State further agree that the measure of the recovery must be the fair market value of the property based upon the most advantageous use to which it can be put. This is the basic and ultimate rule in every recovery for appropriation of property. (Hazard Lewis Farms v. State of New York, 1 A D 2d 923.)
The parties are in substantial disagreement as to the fair market value and as to the matters to be considered by the court in naming a determination of the fair market value.
*35 The claimant is a real estate investor and developer and at the time of trial had spent some 30 years in the real estate business. He had participated in some 75 commercial real estate development projects and at the time of trial was engaged in the construction of 9 shopping centers, 2 of which were of a large size constituting so-called regional shopping centers.
As a result of inquiries by chain store retail enterprises of various types, claimant became interested in the establishment of a regional shopping center in the triple cities area consisting of Endicott, Johnson City and Binghamton in the latter part of 1952. He had previously become familiar with the area having erected a store in Binghamton in 1946.
In December of 1952, at the request of the claimant, a real estate broker from New Jersey went to the triple cities area for the purpose of locating a suitable plot of land for the erection of a regional shopping center. In January, 1953 this real estate broker recommended to the claimant that the best available plot consisted of about 35 acres located on the south side of Vestal Parkway which was a four-lane divided highway and was a part of Route 17. This plot was located at the south end of a new bridge then under construction crossing the Susquehanna River from the east part of the Town of Vestal to Johnson City with a traffic interchange with Route 17.
The plot was bounded on the west by a secondary road known as Bunn Hill Road. It had a frontage of about 1,765 feet on the east bound lanes of Route 17 and the south end of the traffic interchange for the bridge then being constructed. It was bounded on the east for a distance of about 1,086 feet and on the south for a distance of about 1,500 feet by property previously acquired by the State of New York for purposes of Harpur College. The plot had a frontage along the east line of Bunn Hill Road of about 442 feet with a total depth of about 1,200 feet. The traffic interchange from Route 17 to the bridge then under construction was a nonaccess highway and for all practical purposes access to Route 17 was limited to the 240 feet of frontage on Route 17 from the east end of the bridge interchange to the easterly line of the plot. In the opinion of claimant’s real estate expert and architect, the access from Route 17 and Bunn Hill Road was sufficient for use of the plot as a shopping center.
At its northerly boundary the plot was about at grade with Route 17 and sloped gently upward to the south. This was a favorable condition in that it would minimize the expense of grading and fill and enhanced the advantages of the plot in terms of visibility to potential customers.
*36 Claimant examined the area in search of suitable sites for a regional shopping center and concurred with the recommendation of the real estate broker.
On April 16, 1953 claimant contracted to purchase a major portion of the plot appropriated and on April 22, 1953 he contracted to purchase two smaller plots contiguous to the major plot, each smaller plot having a frontage of about 120 feet on Bunn Hill Road with a depth of 200 feet. Claimant did not contract to purchase a piece lying on the east side of Bunn Hill Road with a frontage thereon of 60 feet commencing about 240 feet south of the intersection of Bunn Hill Road and Route 17 and having a depth of 200 feet.
At that time the property lying south of Route 17 was zoned for business use to a depth of 200 feet from Route 17 and the balance was zoned for residential use. About June, 1953 claimant retained counsel for the purpose of seeking rezoning of the property which he had contracted to purchase for commercial use and at about the same time claimant employed an architect to prepare sketches for use on the rezoning application and to design a shopping center on the plot. Inquiries were directed to various retail enterprises concerning possible interest in leasing space in a shopping center erected on the property. Various preliminary steps to construction such as an investigation of available water supply and soil test borings were carried out.
The entire area for which claimant had contracted to purchase as well as the plot on the east side of Bunn Hill Road which he had not contracted to purchase was rezoned for commercial use in July, 1953.
A number of national, regional and local retail enterprises had indicated to the claimant that they would lease stores in the proposed shopping center and by October, 1953 American Stores Company, a national retail food chain, had carried negotiations for a store to such a point that a lease was being prepared reflecting the conditions under which this company would lease a 15,000 square foot store in the proposed shopping center. Grand Union Company, another retail food chain, had indicated an intent to lease a store of 15,000 square feet but with much less detail worked out than in the case of the American Stores Company.
On December 17, 1953 claimant took title to the plot which he had contracted to purchase, paying a total consideration of $156,892. The transactions had been negotiated by the real estate broker who had recommended the site to the claimant but the real estate broker was paid by the sellers and not by *37 claimant. Preliminary work for the development continued until the latter part of February, 1954 when all such work was discontinued upon receipt of information that the property was to be appropriated for the purposes of Harpur College.
In dealing with potential tenants, claimant indicated that construction was planned to start in September of 1954 with stores available for occupancy in September, 1955. Claimant testified that any lease on this' plan would have contained a provision permitting commencement of construction at any time from September, 1954 to September, 1955 with similar leeway in the availability of space for occupancy. Other witnesses testified in considerable detail as to the long process and extended time involved in negotiating specific leases and preparing plans to the needs and desires of specific tenants, which work had not actually started prior to February, 1954.
Thus in February, 1954, when all work on the project was discontinued and immediately prior to the taking, the claimant owned a vacant and unimproved lot of land which was physically in precisely the same condition as at the time of the contracts for purchase in April, 1953. The only changes directly affecting the plot had been the rezoning from business and residential use to commercial use and completion of the Vestal-Johnson City Bridge and traffic interchange with Boute 17. All planning for the use of the property was in a preliminary and tentative stage with no commitments concerning improvement and construction with the exception of the employment of an architect at a fee based upon a percentage of cost and with no commitments concerning occupancy of such improvements as might be erected. The productivity of the property based upon use as a shopping center was some millions of dollars removed in terms of investment and not less than a year removed in terms of time.
Claimant presented extended and detailed evidence bearing . upon the character of the plot, its location in reference to heavily populated areas, history of population and economic growth in the area, history of the volume of retail business, highway development and plans, accessibility and projection of future growth of the area. All of this evidence, together with the opinions of four real estate experts, was presented for the purpose of establishing that the highest and best use of the property was for development of a shopping center.
The only expert witness for the State expressed the opinion that the highest and best use of the plot involved the use of only about 10 acres for a small shopping center with the balance utilized for residential purposes. The principal basis of his *38 opinion was that a shopping center utilizing all the property would not be economically sound in view of the existing retail establishments in the area. He did not believe that sufficient volume of business could be attracted to a shopping center on this plot to support the necessary investment for construction of a shopping center utilizing the entire plot.
This expert thus arrayed himself not only against the opinions of claimant’s four experts but also against the fact of what claimant had done in reliance on inquiries and informal 3ommitments from a number of business enterprises and the action of the Town of Vestal in rezoning the property after some investigation of claimant’s activities at other places.
Apparently even the State found its expert’s position untenable for it has requested the court to make a finding of fact that “ The highest and best use of the appropriated property was for development as a shopping center.” It is thus conceded that the value of this property was enhanced by a present recognition of its adaptability and suitability for development as a shopping center. That enhancement of value must be considered in any determination of fair market value. (Matter of Simmons, 130 App. Div. 350, affd. 195 N. Y. 573, affd. 229 U. S. 363.)
The State urges that there was no material difference in value between the time of purchase and the appropriation some 18 months later. It seeks a finding of damage in the amount of $175,000 which was a fair market value testified to by its expert even though it has apparently abandoned the basis on which that expert arrived at his opinion of value.
The claimant urges that the proper measure of full market value is reflected in the opinions presented by its experts. Two of these experts, Mr. Hoyt and Mr. McAuliffe, appraised the property by the technique known as the land residual method. In applying the technique here, both experts took as a starting point generally known and accepted figures of population and income for Broome and Tioga Counties. They then made certain assumptions as to the trading area which would be served by this proposed shopping center and as to the percentage of business within that trading area which would be attracted. They then projected the size and cost of each retail establishment sufficient to provide that assumed volume of business by applying historical volume per square foot figures and construction costs. Based upon these assumptions, an anticipated gross rental figure was obtained and from this figure assumed costs of operation, maintenance, depreciation, interest charges, and return on investment in cost of building were deducted to arrive *39 at a net annual rental to the owner. This net amount was then capitalized at an assumed rate with the result given as the land value after completion of the shopping center. This value was then discounted an arbitrary amount in view of the fact that all an investor could purchase was vacant, unimproved land far removed in time and money from productivity. On this ■basis Mr. Hoyt found a fair market value of $875,000 and Mr. McAuliffe a value of $665,000.
Claimant urges that in view of Mattydale Shopping Center v. State of New York (303 N. Y. 974) these opinions of value or at least the estimates of potential return must be regarded as a reflection of. fair market value. In that case however, what was to be built had actually been determined and cost thereof set by bid and four leases had actually been signed. These were factors which could have been transferred by a seller to a buyer and under those circumstances the court could properly consider as an element of fair market value, “ clearly-to-be expected future earnings ”. (St. Agnes Cemetery v. State of New York, 3 N Y 2d 37, 45.) Here there had been no determination of what was to be built and the seller had nothing which he could transfer other than vacant land. While claimant sought to establish commitments by prospective tenants as definite, any such commitments were nontransferable and apparently personal to the claimant. Thus the representative of American Stores Company testified:
“A. I would say that our relationships with Mr. Levin are such that, if we would tell Mr. Levin that we would go on a lease, that would be the agreement.
“Q. Insofar as your company is concerned?
“ A. Yes. However, we would draw up a lease and the final signature would be the final thing.”
While these appraisals may not be adopted as a proper measure of fair market value, the testimony may not be ignored insofar as it properly reflects matters which would be considered by a willing buyer and willing seller. (Matter of Niagara, Lockport & Ontario Power Co. v. Horton, 231 App. Div. 402; Sparkill Realty Corp. v. State of New York, 254 App. Div. 78, affd. 279 N. Y. 656.)
Claimant also presented an opinion of value by the real estate expert who negotiated the purchase by claimant from the three prior owners. He stated the fair market value to be $698,000. The manner at which he arrived at this opinion was not thoroughly explored but it was apparently based upon his general experience and judgment as a real estate broker influenced by sales or proposed sales of shopping centers and *40 shopping center property in other areas. The effectiveness of his testimony is seriously impaired by his relationship to the progression of events.
He went to the area at the request of the claimant. In negotiating the purchases however, he apparently acted for the sellers and accepted commissions on the transfers by them at a total price of $156,892. Between that action on his part and the date of the taking the only actual changes directly affecting this property were the rezoning and the completion of the Vestal-Johnson City Bridge. The rezoning was certainly contemplated at the date of contract and an assessment of the possibilities of success or failure on that application would necessarily have been made by any reasonable buyer and seller prior to that time. While success undoubtedly added some value, it cannot account for anything like an increase of $539,108 in value.
The completion of the bridge falls in the same category. While the extent of the use may have been conjectural at the time of contract whereas it was determinable at the time of appropriation, claimant did in fact and any reasonable buyer and seller would have taken into consideration the fact of construction and imminent completion. The fact of completion cannot account for any such increase in value as this expert claims. The rezoning and bridge completion together cannot justify any such increase in value.
If this testimony as to value is to be accepted, it would seem a necessary corollary that this real estate broker acted for the sellers and was willing to accept a commission from them on a purchase price far below fair market value.
The fourth expert for the claimant testified to a value of $523,500. This expert also found the highest and best use of the property to be for shopping center development. He arrived-at his opinion of value principally on the basis of an analysis of other land transfers in the area. By his own testimony however, there were no comparable sales, since in his opinion this plot was unique for this purpose in the area and there was no known transfer of any reasonably similar plot for a similar purpose. As a result, the application of other sales in the area required a projection of value by comparison. Thus a value per acre was projected by taking the sales of a comparable area west of this plot but substantially below grade and adding to the purchase price the cost of fill and then allowing for topographical advantages of the plot appropriated. In other instances the property transferred was substantially above grade and cost of excavation was estimated and used to *41 project a comparable value. Other sales involved very much smaller plots for such specialized use as gas stations or motels.
In many instances the testimony of this expert was based upon the testimony of a qualified engineer as to cost of fill or excavation and as to comparable utility from a construction standpoint. The conclusion of value of this expert appears to rest almost as much upon speculative factors as do the conclusions of Mr. Hoyt and Mr. McAuliffe. While testimony as to other sales in the area is helpful to the court, the conclusion drawn therefrom does not answer the question presented.
Nor is that question answered by reference to the purchase price paid by claimant as the State contends. It is the obligation of the condemnor to substitute in the hands of the con-demnee a “ full and perfect equivalent in money”. (United States v. Miller, 317 U. S. 369, 373.) The measure of that full and perfect equivalent in money is not the cost to the claimant but the fair market value for the highest and best use at the time of appropriation. (Matter of Simmons, 130 App. Div. 350, supra.)
The question presented here is at what price would this piece of vacant and unimproved land zoned for commercial use, have changed hands between a reasonable buyer and a reasonable seller on October 11, 1954 in view of the suitability of the plot for development as a shopping center, the size of the investment of time, effort and money for such development, the potential return on that investment, the extent of the risk of failure and the extent of the risks of construction, negotiation of leases, competition and operation of tenants which might seriously reduce the potential return? Taking into consideration all evidence affecting this question and all relevant factors bearing upon fair market value and having viewed the property, the court finds that the fair market value on October 11, 1954 was $245,000.
Claimant is entitled to judgment in the amount of $245,000 for all legal damages resulting from this appropriation, with interest thereon from October 11, 1954.
Let judgment be entered accordingly.