William C. Hecht, Jr., J.
The issue presented on this claim is the proper measure of damages to be awarded for this additional taking for the Addition to Lincoln Square Urban Renewal Project. The original taking occurred on February 28, 1958. The additional taking involved in this claim occurred on October 1, 1958. The court viewed the properties in compliance with the statutory requirement.
Claimant’s expert, Wittman, appraised the property as of February 28, 1958 at $1,882,510 for the land and $817,490 for the building, a total of $2,700,000. He testified further that immediately upon the original taking from which this property was excluded, the value increased by 50% to $4,000,000.
His testimony was:
“ Q What would your appraisal have been of this property on February 27,1958, before the vesting — I will take your date — based on the $80,000 land unit? Can you give me that? A Yes.
££ Q What is the amount, for the land and building? A For land and building, as of February 28, 1958, the moment before title vested for the Lincoln Square project, my appraisal for the land and building would be $2,700,000.
<£ Q 'So that, over night, without any physical change of any ldnd, without anything happening at all, your opinion of the value of that property jumped from $2,700,000 to $4,000,000? A No sir, not over night. The same day. The moment after.
££ Q One minute after the vesting? A That’s right.”
He further testified:££ Q Between March 1,1958 and October 1, 1958 when condemnation actually took place, was there any change in the market value of this property, in your opinion? A No sir.”
*621 Both the original taking and the instant taking were had pursuant to the authority conferred upon the city by section 1 of article XVIII of the Constitution, and section 72-k of the General Municipal Law. (See Kaskel v. Impellitteri, 306 N. Y. 73, cert. denied 347 U. S. 934; 64th St. Residences v. City of New York, 4 N Y 2d 268.) It is conceded that the city would not have the financial resources required for a slum clearance and redevelopment program without assistance by the Federal Government (authorized by U. S. Code, tit. 12, § 1701 et seq. and U. S. Code, tit. 42, § 1450 et seq.; see 64th St. Residences v. City of New York, supra).
The first formalization for a joint sponsorship for slum clearance in the Lincoln Square area occurred on September 22,1956. On that date, the Board of Estimate adopted a resolution authorizing the Committee on Slum Clearance to process “ the proposed plan” for an urban renewal project with the Federal Urban Renewal Administration. This proposed plan included all the property included in the original taking, plus the instant property, plus some additional properties.
On May 1, 1957 an exchange of letters between city and Federal official's indicated the project would have to be confined to the property included in the original taking, because the Federal Government had decided to limit its financial contribution. Public announcement was immediately made of this change. It was formally agreed to between the city and the Federal Regional Urban Renewal Administration in August, 1957. On November 26, 1957 the final revised plan (which, as noted, did not include the instant property) was approved by the Board of Estimate, and the condemnation proceeding involving the original taking was authorized.
The city thereupon entered into contracts with three sponsors for the various development projects: on December 10, 1957, with Lincoln Center for the Performing Arts, for buildings to be used for cultural purposes; on December 24,1957, with Ford-ham University, for buildings to be used for educational purposes ; and on February 25, 1958, with Webb & Knapp Lincoln Square Corporation, for multi-story housing buildings. On February 28, 1958 title vested in the city to the lands involved in the foregoing contracts, and it promptly reconveyed to the three sponsors.
On May 22, 1958 the chairman of the Slum Clearance Committee transmitted to the Board of Estimate a resolution which the board adopted. This authorized the committee to make application to the Federal authorities to enlarge the project by including claimant’s property, and turning it over to the *622 Lincoln Center for the Performing Arts. The Federal authorities having given their consent on August 21, 1958, the Board of Estimate approved the enlarged project and authorized the instant condemnation proceeding.
On the basis of this delay of six months between the original taking (February 28) and the resolution authorizing the instant taking (August 21), claimant claims an appreciation of 50% in the value of its property. I find no logic or equity in claimant’s position, and even if that position were tenaJble, it has not satisfactorily proved its claimed value.
It may be conceded that the projects contracted for by the city, when completed, would have greatly enhanced the value of the surrounding property, particularly that of claimant. If the sponsors carry out their commitments, claimant’s property would be directly opposite the Philharmonic Concert Hall, the Metropolitan Opera House and an underground city garage, and would be 350 feet east of the Webb & Knapp housing project.
Claimant’s contention may be summarized in the following two passages from its brief:
“ Claimants had to do nothing in order to reap the benefit, other than to await completion of the project.”
“ The City’s appraisal as of October 1, 1958 was not the result of any consideration of the important factors in this case; (1) the cataclysmic change in values caused by the City’s conveyances to the several sponsors.”
First, it should be observed that there was no assurance on October 1, 1958 that any or all of these projects would be completed. Anyone familiar with the history of New York real estate knows that many worthwhile, projects have had to be abandoned for one reason or another. It is true that each of these contracts contains a recapture clause in the event that the sponsors did not carry out the proposed project, but that does not insure completion of the projects.
Secondly, and more important, claimant is seeking to get more than just compensation, which the Constitution assures it. It does not seem equitable to give claimant a 50% increase in the value of its property resulting solely from the fact that the city had to defer for six months taking land which it originally had included in the project, because the Federal Government during that period was reluctant to make the commitment which it finally did make.
Claimant’s reliance on United States v. Miller (317 U. S. 369) is misplaced. The “ bone of contention ” in that case was thus summarized by the court (p. 375): “ Should the owner have the benefit of any increment of value added to the property *623 taken by the action of the public authority in previously condemning adjacent lands ? If so, were the lands in question so situate as to entitle [claimants] to the benefit of this increment?”
In deciding against claimants, the court said, per Roberts, J. (pp. 376-377):
“ If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity. If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.
“ The question then is whether the respondents’ lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include ¡them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government’s activities.
“In which category do the lands in question fall? The project, from the date of its final and definite authorization in August 1937, included the relocation of the railroad right-of-way, and one probable route was marked out over the respondents’ lands. This being so, it was proper to tell the jury that the respondents were entitled to no increase in value arising after August 1937 because of the likelihood of the taking of their property. If their lands were probably to be taken for public use, in order to complete the project in its entirety, any increase in value due to that fact could only arise from speculation by them, ox by possible purchasers from them, as to what the Government would be compelled to pay as compensation.”
Claimant here seeks to distinguish the Miller case on its facts. There the Government was continuously committed to the project from August, 1937 (when it was authorized by Congress), until December, 1938 (when the Government filed its complaint *624 in eminent domain). In the ease at bar there was a hiatus of six months between the original taking (February 28) and the Board of Estimate’s resolution authorizing the additional taking (August 21). This hiatus does not seem to me sufficient, in view of the fact that (a) the plans of .the Committee on Slum Clearance, of the City Planning Commission, and of the Board of Estimate always included the instant property; (b) it was eliminated only because of the Federal Government’s reluctance to advance the necessary funds; and (c) it was reactivated by the Slum Clearance Committee three months later, and definitely authorized by both Federal and city authorities six months later. Under the circumstances, I think it fair to say that claimant’s lands “ were probably within the scope of the project at the time the [City] was committed to it ”, and that “ the [City] ought not to pay any increase in value arising from the known fact that the lands would probably be condemned.”
This conclusion is fortified by the fact that, as already noted, nothing was done to advance the project in the interval between the original taking and the additional taking, except for the execution of the contracts with the three sponsors, which gave no assurance of completion of any or all of the projects. As I read the Miller case, especially the portions italicized above, the proximity of the public improvement may be considered as enhancing the value of .adjacent lands only after the former is actually 1 ‘ erected on the land taken. ’ ’
In any event, even if claimant’s legal argument is accepted, it has failed to prove its claimed value. Its expert, Wittman, projected anticipated income from either one of three improvements: (a) a modern office building, (b) an apartment house, or (c) a combination office building and hotel — in each case with stores on the ground floor. He concluded that one of these would be the highest and best use of claimant’s property because of the proximity of the three projects and the underground garage which have already been described. On the basis of this projected improvement, he arrived at a value of $4,000,000 for claimant’s property.
The basis of his appraisal is shown by the following testimony:
“ Q Well, did you use that income of the property? A Yes.
“ Q You took into consideration the net income of this property? A Not of this, of the projected property.
< ‘ Q Did. you consider that income and capitalize it, and use that as a basis for your $4,000,000 appraisal? A Yes, on the property that this land could be best put to, I did, yes.”
*625 He further testified: “ Q In other words, to capitalize a new building such as you have described, which would put this land to its best available use, if you have the actual cost of construction, or if you have the actual rentals- — if you knew the actual rentals and you knew the actual operating expenses and the actual net, you could give us then, on the basis of capitalization of net income, what the value of that building would be in specific terms? A I can do that just as I do for mortgage lending purposes, Mr. Abberman. I am engaged by various institutions on buildings that have never been built, from plans, to anticipate income and expense and capitalize the net return and come up with an appraised value, and on the basis of that value the bank lends money. ’ ’
The courts have refused to accept the valuation based on the estimated income of a nonexistent building (Matter of City of New York [Blackwell’s Is. Bridge], 118 App. Div. 272 [1st Dept.], appeal dismissed 189 N. Y. 512; Greenfield v. City of Philadelphia, 282 Pa. 344; Bronx Parkway Comm. v. Mayer, 179 N. Y. S. 792).
In the. Blackwell’s Is. Bridge case (supra) the court said, per Clarke, J. (pp. 274-275):
“ An examination of the record discloses certain fundamental errors, the commission of which must have brought about the extraordinary result arrived at. * * *
“ In regard to the vacant lots, parcel No. 31, a witness was asked what would be the best use to which these lots could be put; he replied: The erection of ‘ three apartment houses, * * * making each building about 33 feet.’ He was then allowed to testify, over objections and exceptions, that the cost of constructing three such buildings would be $75,000, and that the rental value of such buildings would be between $14,000 and $15,000 a year. This was clear error. It involved so much of the elements of uncertainty and speculation as to be inadmissible as proof of any fact. As said in the case of Tallman v. Met. El. R. R. Co. (121 N. Y. 119): ' There can be no certainty that the plaintiff would ever have erected dwelling houses upon the lots, and there could be no certainty as to the rents which could have been obtained from them either with or without the railroad in the street. ’ (See Woolsey v. N. Y. El. R. R. Co., 134 N. Y. 327.) ”
In Bronx Parkway Commission v. Mayer (supra) “ the witnesses proceeded to describe the character and cost of the several buildings to be erected thereon, and the purposes for which stores, offices and lofts would be rented, and estimated the *626 cost of such buildings, and the probable rents to be paid by the tenants thereof ” (p. 793). Mr. Justice Tompkins set the award aside, saying (p. 794): “ This seems to me very ridiculous. * * * Their conclusions, in other words, were based upon all of these imaginary and speculative propositions, and these visionary theories ”.
In the Greenfield case (supra) the Supreme Court of Pennsylvania said (p. 354): “ While it may be true that the ability to readily rent property at advantageous and profitable figures is an element entering into its market value and one that should be taken into account by witnesses in fixing that value, nevertheless it is somewhat difficult to see how an opinion as to the market value of office space per square foot in a building not yet erected can have any substantial relevancy to market value, thereby meaning fair selling price, of the land. There necessarily would be so many factors to be taken into account in determining what the net avails would be to the owner from the rents that the result of any determination reached from testimony as to what the rentals might be would be speculative in the extreme.”
Mattydale Shopping Center v. State of New York (303 N. Y. 974) does not support claimant’s position. There the structure to be built was fully determined — a shopping - center with eight rentable units. Architects’ plans had been completed, plans and specifications had been filed with the Department of Labor, and bids for construction had been received. -Since four stores had already been rented under executed leases, the rental value of the remaining four could readily be ascertained. As was said-by the Court of Claims in Levin v. State of New York (8 Misc 2d 33, 39): “ Claimant urges that in view of Mattydale Shopping Center v. State of New York (303 N. Y. 974) these opinions of value or at least the estimates of potential return must be regarded as a reflection of fair market value. In that case however, what was to be built had actually been determined and cost thereof set by bid and four leases had actually been signed. These were factors which could have been transferred by a seller to a buyer and under those circumstances the court could properly consider as an element of fair market value, ‘ clearly-t-o-be expected future earnings ’. (St. Agnes Cemetery v. State of New York, 3 N Y 2d 37, 45.) Here there had been no determination of what was to be built and the seller had nothing which he could transfer other than vacant land.” .
I believe the method used by the city’s real estate expert to compute the gross land area is in accordance with sound appraisal practice and, accordingly, I have used his computa *627 tions to establish land value. I have used a unit lot value of $75,000 for Broadway and $30,000 for both 65th and 66th Streets, with a 30% increment for conjunctive use with Broadway. In addition, I have allowed 25% for plottage and multiple frontage. This computes to $1,588,176 for the land. I have employed Mr. Wittman’s capitalization rates and value the improvement at $617,768, making a total award of $2,205,944.
Let the Corporation Counsel prepare and submit a partial tentative decree accordingly.