570

In the Matter of the CITY OF NEW YORK, Appellant, Relative to Acquiring Title to Real Property for Throgs Neck Expressway in the Borough of The Bronx. ROBERT P. MARSHALL et al., Respondents.

First Department, June 28, 1962.

*Irving Genn* of counsel (*Seymour B. Quel* with him on the brief; *Leo A. Larkin, Corporation Counsel*), for appellant.

*Monroe Goldwater* of counsel (*Leon Liner* with him on the brief; *Goldwater & Flynn,* attorneys), for Robert P. Marshall, respondent.

*Matthew J. Tackella* of counsel (*Loretta A. Conway* with him on the brief; *Lamb & Lamb,* attorneys), for Constantino Di Tullio, respondent.

BREITEL, J. The city appeals from awards in condemnation after a second trial, the results on the first trial having been reversed by this court and a new trial ordered (8 A D 2d 365, opinion by McNALLY, J., dissenting opinion by RABIN, J. P.). The awards allowed on the second trial are substantially the same as upon the first. The city urges that the awards are excessive, and that the trial court disregarded this court's holding and views on the prior appeal.

As will appear the awards are excessive and they should be reduced. Since upon the second trial the parties have had the opportunity to submit additional evidence in the light of this court's prior opinion, the court should dispose of the matter rather than remand the case for still another trial (Civ. Prac. Act, § 584, subd. 2).

Two properties, separately owned, are involved. The taking was for the Throgs Neck Expressway in The Bronx, a project which, for some time prior to the taking, had been in planning and in the public notice. The area was a sparsely settled shore region of The Bronx, described by one of the expert witnesses as the last in The Bronx to sustain a vigorous residential development. One property (Damage Parcels Nos. 322, 323, 324), consisting of approximately 51,268 square feet, was largely vacant except for the recent construction of a modern gasoline station with three bays, leased to the Texas Co. and subleased to an operator. The three parcels constituted an entire, irregularly-shaped block. The other property (Damage Parcel No. 654), consisting of 67,500 square feet, was also largely vacant, except for a one-story masonry building and a fenced-in yard for the storage of cemetery monuments. Title had vested October 15, 1957. More detailed descriptive facts may be found in the prior opinion of this court.

The trial court awarded $281,000 for the gasoline station property, and $75,900 for the monument property. The issue

is the fair market value (*Matter of Board of Water Supply of City of N. Y.*, 277 N. Y. 452, 456).

The gasoline station was constructed in 1956, when it was already known that the Expressway was to be built in the area, although the precise route was yet unknown. The expected construction of the Expressway enhanced the prospects for gasoline stations in the area. The cost of construction of this one was $40,000. It was built by the owner to the specifications of the tenant, the Texas Co., pursuant to a 15-year lease executed in December, 1954, with a further right of renewal for two successive periods of 5 years each. The annual rent was $8,400, but an amendment to the lease, executed in March, 1957, provided for an additional rent of 2 cents per gallon for gallonage in excess of 420,000 per annum, the total rent not to exceed $9,600. The Texas Co. subleased the premises to an operator at an annual rent of $5,880, described by claimant's witness as really on a month-to-month basis. The station never sold enough to invoke the escalator provision in the prime lease, although the gallonage increased substantially during the period of operation.

The assessed valuation of the station property was $117,000.

Only one comparable gasoline station property sale in the general area was submitted by the parties. Analyzed, it is not very fruitful because in order to determine the relevantly comparable elements one must first conclude which are the critical elements in the property involved in the taking. The result is an exercise in circular reasoning. Apart from that station, which sold in April, 1957 for $60,000, there are also some land sales in this sparsely developed area. These too do not provide much information, and as will be seen later the ratio of assessment to sales prices wholly fails to provide an adequate basis from which a value can be determined in the first instance.

On the prior appeal this court commented on the failure to give the assessed valuation any consideration, although no instruction was given that any particular weight be assigned to it. Of course, the weight will vary inversely with the other proof of value in the case. Thus, in a case such as this, where the remaining proof in the record was all of questionable significance, the failure to consider the assessed valuation would be a mistake (*Matter of Simmons* [*Ashokan Reservoir*], 132 App. Div. 574, 576; *Adler* v. *Berkowitz*, 229 App. Div. 245, 249, mod. on other grounds 254 N. Y. 433; cf. *Matter of City of New York* [*School Site*], 222 App. Div. 554, 556, affd. 250 N. Y. 588; 19 N. Y. Jur., Eminant Domain, §§ 145–146; 1 Orgel, Valu-

ation Under Eminent Domain [2d ed.], § 154). The statute, of course, requires that the assessed valuations be made a part of the record (Administrative Code of City of New York, § B15-8.0, subd. 3). On the other hand, the assessed valuation could hardly be determinative of value. This could not be made much clearer when it appears that even the city's expert testified to values much higher than the assessed valuation. It was unfortunate, then, that time and emotion were expended on the second trial in proving the obvious, namely, the inferior probative value of assessed valuations.

Significant in determining the true value of the portion of the property occupied by the gasoline station (Damage Parcel No. 324) are the rents paid under the leases. Claimant would use the higher rent paid the owner by Texas Co. The city would use the rent paid by the operator to Texas Co. The city contends the latter was the realistic rent, and that the higher rent paid to the owner was a speculation based upon the Expressway coming through and providing increased traffic on the approach roads near the station. The claimant argues that the operator's rent was low because the station had a "showcase" or advertising value to the oil company. Of course, the owner and the Texas Co. knew the Expressway was coming through, and expected generally to benefit from it in the future. Moreover, the owner, and undoubtedly the Texas Co., hoped that the property would not be taken. Of course, if the property were taken, there would be no loss since there would have to be full compensation, including the value of the improvement.

On these very contentions and the supporting testimony it is evident that the higher $8,400 rent reflected enhancement of value by reason of the Expressway coming through. To such enhancement claimant is not entitled even if it was not originally contemplated that his land be taken (see *United States v. Miller*, 317 U. S. 369, 376-377; *Matter of City of New York [Lincoln Sq. Prop.]*, 22 Misc 2d 619; *New York Cent. & Hudson Riv. R. R. Co. v. Mills*, 160 App. Div. 6, 7).* Moreover, it is simi-

---

* One, it should be noted, is not concerned here with a likely prospect of general development in or of an area existing for a long time, which may or may not contemplate a taking in eminent domain of parts of the area (*Andrews v. State of New York*, 19 Misc 2d 217, aff'd. 11 A D 2d 599, aff'd. 9 N Y 2d 606, cert. denied 368 U. S. 929; *Matter of Gilroy*, 85 Hun 424; *Matter of Simmons*, 58 Misc. 581, aff'd. 130 App. Div. 350, 356, aff'd. 195 N. Y. 573, aff'd. *sub nom. McGovern v. New York*, 229 U. S. 363; 1 Orgel, Valuation under Eminent Domain [2d ed.], *supra*, § 85).

larly evident that the higher rent also reflected a speculation on the future — a speculation of peculiar interest, for obvious reasons, to major oil companies — namely, obtaining or preserving footholds in key areas where heavy motor traffic is or *may* come.

It is true that the rent paid by the operator may have been somewhat lower than called for by virtue of the advertising value of the site, but this is a factor which has not been established to have been of substantial significance, certainly not to the extent of accounting for the difference of $2,520 between the rents reserved in the several leases.

Consequently, the rent actually charged and paid by the operator comes closer to reflecting true current value.

Taking $6,000 as the rounded rental value of the part of the station property actually leased (Damage Parcel No. 324), the value of the parcel may be obtained by capitalizing the rental value — it being, for all practical purposes, a net rent, so far as the record shows. The claimant urged a 6% capitalization rate, while the city urged an 8% capitalization rate. Neither side demonstrated with any force the applicability of either of the two rates selected, and it is evident that an average of the two is the more appropriate. Indeed, on the first trial the city expert used a 7% capitalization rate. Applying the 7% rate Damage Parcel No. 324 may be valued at $86,000 in rounded figures.

Turning, then, to the other two damage parcels (Damage Parcels Nos. 322, 323), vacant land adjoining the gasoline station premises, the record contains no objective support for the square-foot value of $3.30 propounded by claimant's expert. The sales which claimant relied upon were not offered as comparable but only as purportedly demonstrating the lack of any correlation between sales price and assessed valuation. Claimant did not even analyze its sales to find the square-foot value. Nothing else, except the expert's experience, lends any weight to the $3.30 figure.

As noted in the majority opinion on the prior appeal, the award, for these parcels appears then to have been determined on the basis of some presumed relation between their value and that of the adjoining gasoline station property. Since the trial court now did not indicate what increments it used for plottage, frontage, and the like, the basic square-foot value cannot be computed. However, it must have been in excess of $2. Whether this was a compromise between the amounts used by the opposing experts or the result, again, of presuming a relation-

ship to the value of the gasoline station, it is not supported by the record.*

The city, at least, offered some sales, analyzed to show the square-foot value, to support the figure of $1.40 used by its expert in computing the value of Damage Parcels Nos. 322–323. These sales, which were analyzed by both parties, together with those sales offered by claimant which were analyzed by the city, reflect square-foot values ranging from 11 cents to $1.68, taking the highest and lowest figure used by either side. The only exception is the sale of the gasoline station opposite the one taken, which claimant analyzed at $4.78 per square foot and which involved the special value of property used for such purposes. Thus, whether comparable or not, there is no sale in the record, apart from the noted exception, which reflects a square-foot value as high as that contained in the award.

The city's square-foot value of $1.40, supported as it is in some measure by the sales, should be accepted. The two parcels consisted of roundly 41,000 square feet, and consequently one arrives at a base value of $57,400.

In another aspect of this property the city may have been chary in applying the factors for frontage. Claimant was right, as the map shows, that it had the advantage of frontage on at least three streets, and less certainly on a fourth street,** albeit

---

* Common experience bears out what is said in McMichael's Appraising Manual (3d ed.) at page 361 concerning the valuation of land adjoining gasoline station property: "A most striking fact revealed in connection with the valuation of gas station sites is that the value of land used for such purpose bears very little relation to the value of adjoining lands. It is frequently found that for the use to which such sites are being placed they are worth from five to ten times as much as adjoining land. Indeed, some unusually strategic sites, in outlying neighborhoods, where heavy traffic exists, where visibility is extraordinary, where competition has as yet failed to appear, and where buying urge abounds, have been found to be worth hundreds of times the value of given units of agricultural land immediately adjoining. *One such site was found to be worth 1,600 times the value of adjoining land of identical area!* This was a point intersection or 'Y' where two heavily traveled boulevards converged into a main highway near a large California city in which unusually heavy traffic prevailed 12 months of the year." (Emphasis in the original.) Perhaps, as claimant argues, without expert testimony to support the view, additional values may sometimes attach to adjoining land because of the opportunity to attract gasoline customers to other services and merchandise. Whether that would be true in this case cannot be surmised.

** The doubt as to fourth frontage arises from the fact that the gasoline station segment occupies that front entirely. Arguably, the capitalized value of that segment includes the "fourth frontage." However, it is not clear that there is a total overlap. Moreover, whether it be strictly a fourth frontage or a special plottage advantage or it fall in still some other category, it is reasonably clear that the owner's interest includes a block with four frontages. Under the circumstances, claimant is given the benefit of the doubt in this case.

of different lengths. Accepting the city expert's increments for corner and adjoining key lots, and increasing the adjustments to give claimant the benefit of four frontages at the rate of 5% each, and using 10% for plottage overall, yields a gross figure for Damage Parcels Nos. 322–323 of $81,000, also rounded. Adding this to the value arrived at for Damage Parcel No. 324 gives an aggregate valuation of $167,000 to which the award of $281,000 should be reduced.

On the first trial, it should be observed, the city expert, another than the one on the present trial, testified to a value of $215,800 for the same property. True, such testimony is available to the claimant as an admission by the city (4 Wigmore, Evidence [3d ed.], § 1075; McCormick, Evidence, pp. 526–527). Nevertheless, the record is quite persuasive that on the first trial none gave proper recognition to the enhancement of values by reason of the impending taking.

Turning now to the monument property (Damage Parcel No. 654), one finds even less of usefulness in the record in the way of comparable land sales. The assessed valuation was only $11,000. More significantly, the property was purchased as recently as September, 1954 for $13,000 by the claimant at a public auction sale held by the city, after title was taken by in rem tax foreclosure proceedings. Against these values, the trial court awarded claimant $75,900.

Once again, the trial was consumed with unnecessary emotion because this court had, on the first appeal, held it error to disregard the auction sale purchase price, a view with which claimant disagreed vigorously. But neither then nor in a later case has this court said that such a sale price is determinative, nor that it is to be given greater weight than any other datum.

As in the case of assessed valuation, a prior sale price, even at an auction sale, will have usefulness inversely with the other proof in the case to establish property value (cf. *Matter of City of New York* [*Maxwell*], 15 A D 2d 153, 162, per STEUER, J.). But that an auction sale may not be taken as the market price, as the city would do, would seem to be apparent. The auction price is probably somewhere in between a forced sale and a true market sale, and, may be given some weight (see 4 Nichols, Eminent Domain [3d ed.], § 12.3113, especially subd. [1]). The opposing experts in this case quite properly did not consider it controlling.

There comes a point, however, where assessed valuation and an auction sale price may be given some significance, even in a case such as this where the experts on both sides arrived at values several times greater than either of those figures. In

the case of assessed valuation, it is notable that even the proof offered by the owner of the gasoline station property (to show the total absence of any correlation between sales prices and assessed value) reflected only two instances where the ratio was as high as the 6 to 1 ratio involved in the award for the monument property. This court took note of this wide discrepancy on the prior appeal and nothing then or in the present record serves adequately to explain it.

So, too, in the case of auction sales by the city, attended largely by professional promoters and land speculators, it is not lightly to be assumed, in the absence of proof concerning particular sales in issue, that property is sold entirely without recognition of its true market value. Significantly, claimant himself was apparently not a professional and purchased for his own business use. In any event, even competition limited to a few knowing professionals will produce prices which are not wholly unworthy of consideration (see *Matter of City of New York* [*Jennings St.*], 207 App. Div. 170, 171; *Hadden* v. *Metropolitan El. Ry. Co.*, 75 Hun 63, 67–68; but, see, *Matter of Board of Water Supply of City of N. Y.*, 277 N. Y. 452, 458–459, *supra*; Jahr, Eminent Domain, § 73).

In this instance, too, as in the case of the station property, the basic land estimate by the city expert of $35,650 should be accepted. However, claimant is entitled to a frontage increment of 10% or $3,565 on the basic land estimate. The city expert incorrectly assigned no frontage because the land was largely vacant. Also, claimant is entitled to the value of the building, fixed by the trial court at $9,000. The " illegality " of the occupancy for lack of a certificate of occupancy is not the kind of total or absolute illegality of which the Court of Appeals spoke in *Kingsland* v. *Mayor* (110 N. Y. 569, 582–583). Rounding the figures, generously, and giving some weight to evaluation on the first trial by the city's expert as an admission available to claimant on the present trial, claimant would thus be entitled to $50,000.

In pursuing the proper analysis of valuation in this case a *caveat* is required. The use of formulations may sometimes give a greater appearance of objectivity than is in fact the reality. At the same time the court, in proper tradition, is required to utilize the evidence, expert and otherwise, supplied by the litigants in determining the case (*Matter of City of New York* [*A. & W. Realty Corp.*], 1 N Y 2d 428, 432–433). Therefore, in applying the analyses and the formulations the determination is, of necessity, limited by the record presentations. Different presentations in another case might very well require

a different approach and even achieve a different result. This is another way of saying that judicial valuations, derived from divergent methods and formulas employed by opposing experts in the same case, may usually be arrived at by more than one route.

In view of the conclusions reached, it has not been necessary to consider the effect of the doctrine of the law of the case. Had it been necessary, the effect would be just short of mandatory, requiring this court, in the absence of extraordinary circumstances, to adhere to its holding on the prior appeal.*

Moreover, in an appellate court with shifting panels of justices sitting in review, the doctrine of law of the case has especial significance. The highest court of the State sat in separate divisions between 1889 and 1891. It was thereafter held many times that it would be intolerable indeed, if the result in the same case, on different appeals to different Benches, might fluctuate because of variant viewpoints in the absence of manifest injustice grounded on egregious error (e.g., *Cluff* v. *Day,* 141 N. Y. 580; *Mygatt* v. *Coe,* 142 N. Y. 78, 81; *Roberts & Co.* v. *Buckley,* 145 N. Y. 215, 229; *Matter of Laudy,* 161 N. Y. 429, 434–435).

The record on both trials with respect to claimant's proof was substantially the same, except for the additional proof designed to show, in contravention of this court's prior holding, that assessed valuation is entitled to no weight. The different proof offered by the city, of course, merely purported to establish that the awards were, indeed, excessive.

The prior holding by this court was that the awards were excessive, and there was the direction following the statute and settled law that the assessed valuation must be considered, although the weight, more or less, to be assigned, was left open. For the trial court, on a second trial, the holding was completely mandatory (*Hornstein* v. *Podwitz, supra,* p. 169; 9 Carmody-Wait, New York Practice., *supra,* § 489, p. 204 *et seq.*). The same holds true for the auction sale price, there being no evidence adduced to discredit the sale entirely.

Accordingly, the supplemental and amended second separate and partial final decree should be modified, on the law and on

---

* (*Politi* v. *Irvmar Realty Corp.,* 13 A D 2d 469; *Hornstein* v. *Podwitz,* 229 App. Div. 167, 169; but, see, limiting affirmance 254 N. Y. 443, 450; *Williams* v. *Board of Trustee,* 210 App. Div. 161, 162; see, also, *Barcelo* v. *Horn & Hardart Co.,* 11 A D 2d 651; 9 Carmody-Wait, New York Practice, §§ 447–450, p. 144 *et seq.*; 5B C. J. S., Appeal and Error, §§ 1821–1824, 1964, generally, and especially at subd. c. par. [3], [p. 567] and subd. d [p. 570]; Note: Conclusiveness of Prior Decisions on Subsequent Appeals, 34 L. R. A. 321.)

the facts, to reduce the principal award to the claimants for Damage Parcels Nos. 322, 323, 324 from $281,000 to $167,000, and for Damage Parcel No. 654 from $75,900 to $50,000 and the decree should otherwise be affirmed, with costs and disbursements to appellant City of New York. Settle order.

RABIN, J. (dissenting in part). I dissent. I believe that the finding of $167,000 for Damage Parcels Nos. 322, 323 and 324 is entirely too low as is the sum of $50,000 for Damage Parcel No. 654.

The sum of $167,000 reflects an award of $86,000 for Damage Parcel No. 324 computed by applying the capitalization method and $81,000 for Damage Parcels Nos. 322 and 323 (vacant land) computed on a square-foot basis. With respect to Damage Parcels Nos. 322 and 323 the claimant's expert testified to an average of $3.30 per square foot. The city's expert testified to an average value of $1.40 per square foot.

The majority accepted the testimony of the city's expert as to basic square-foot value without change and applied thereto the necessary increments. I cannot agree that such complete acceptance is warranted. The city's expert did not prove himself particularly qualified with respect to properties in the neighborhood of the damage parcels involved. Accepting his estimates led to an ultimate result, with respect to the three parcels, far below the figure arrived at upon the first trial by the city's expert, who in this trial was referred to as "an expert beyond reproach."

I think a finding of $2.50 per square foot more closely reflects the value of the vacant land. The evidence of comparative sales, buttressed by the opinion of the claimant's expert, supports that figure. Applying the basic rate of $2.50 per square foot and making adjustments for frontage and plottage would result in a finding of land value for Parcels Nos. 322 and 323 in the sum of $135,000.

With respect to Parcel No. 324 the majority arrived at its figure of $81,000 by capitalizing the rental received from the subtenant rather than the rent paid by the prime tenant. A lease of a gas station has greater value to an oil company than it has to a dealer who must depend for his income only upon the sale of gasoline. To an oil company it has advertising and prestige value. Furthermore, a strategic location is of added value to an oil company which considers location from a long-range viewpoint. Having used the subtenant's rental as a basis for capitalization the majority could not have given consideration to these factors. An owner has a right to the benefit of these

factors which tend to raise the market value of his property. It should be observed that the operator's business in this case rose from 20,000 gallons per month to 28,000 gallons per month in less than a year of operation. In view of this rapid rise we must evaluate the possibility of the subtenant reaching a point where additional rent would have to be paid. Taking all these factors into consideration I think that a figure in the vicinity of $120,000 more properly represents the value of Parcel No. 324 than the $86,000 fixed by the court. That would bring the total for Parcels Nos. 322, 323 and 324 to $255,000 which I believe represents fair value for those parcels taken.*

As stated, the majority found a value of $50,000 for Damage Parcel No. 654. The experts were wide apart in their estimates of square-foot value with respect to this parcel. The claimant's expert fixed the value of $2 per square foot with respect to that portion of the property zoned for retail use whereas the city's expert fixed it at 72 cents per square foot. With respect to that portion of the parcel zoned for residence use, the claimant's expert averaged the value at $1 per square foot as against the city expert's testimony of 32 cents per square foot for property on Graff Avenue and 52 cents per square foot for property on Balcom Avenue. The claimant's expert arrived at a land value of $93,775, whereas the city's expert found a value of $35,650. For the reasons heretofore stated, I think that more reliance can and should be placed upon the testimony given by the claimant's expert, particularly in view of the testimony given by the city's expert at the previous trial. He placed a value on the land of $52,044, which is slightly in excess of 40% over the valuation fixed by the city's expert in this proceeding. The majority arrived at a land value of $40,000 which is $12,000 less than that fixed by the city's expert in the first trial. The trial court apparently used the base figure of $1.45 per square foot for the retail zone and 72 cents a square foot for the residence zone, arriving at a value of $66,900. One cannot arrive at an exact figure for the value of the land particularly where the estimates of the experts are so far apart. However, I believe that as a minimum we should accept a land value of $52,000 as fixed by the city's expert at the previous trial. Adding to that, $9,000, the value fixed by the

---

* If I were to take the figure of $86,000, which the majority found for Parcel No. 324 and add it to the $135,000 which I find for Parcels Nos. 322 and 323 we would arrive at a figure of $221,000, an amount closely approximating the $215,000 figure given by the city's expert at the first trial.

majority for the building, we arrive at a total of $61,000 for Damage Parcel No. 654.

Accordingly, I dissent and would fix the values of Parcels Nos. 322, 323 and 324 at $255,000 and for Damage Parcel No. 654 at $61,000.

BOTEIN, P. J., McNALLY and BERGAN, JJ., concur with BREITEL, J.; RABIN, J., dissents in part in opinion.

Supplemental and amended second separate and partial final decree modified, on the law and on the facts, to reduce the principal award to the claimants for Damage Parcels Nos. 322, 323, 324 from $281,000 to $167,000, and for Damage Parcel No. 654 from $75,900 to $50,000 and the decree otherwise affirmed, with costs and disbursements to appellant City of New York. Settle order on notice.