166

In the Matter of CITY OF NEW YORK, Relative to Acquiring Title to Real Property for Nassau Expressway in the Borough of Queens. PETER GRIMM et al., Appellants; CITY OF NEW YORK, Respondent. (Proceeding No. 1.)

In the Matter of CITY OF NEW YORK, Relative to Acquiring Title to Real Property for 135th Avenue in the Borough of Queens. PETER GRIMM et al., Appellants; CITY OF NEW YORK, Respondent. (Proceeding No. 2.)

In the Matter of CITY OF NEW YORK, Relative to Acquiring Permanent Easements in Connection with Nassau Expressway in the Borough of Queens. BRU-BAR HOLDING, INC., Appellant-Respondent; CITY OF NEW YORK, Respondent-Appellant. (Proceeding No. 3.)

In the Matter of CITY OF NEW YORK, Relative to Acquiring Title to Real Property for a Park in the Borough of Queens. PETER GRIMM et al., Appellants; CITY OF NEW YORK, Respondent. (Proceeding No. 4.)

Second Department, December 27, 1983

APPEARANCES OF COUNSEL

*Samuel Goldstein & Sons* (*Samuel Goldstein* and *M. Robert Goldstein* of counsel), for appellants in Proceedings Nos. 1, 2 and 4 and appellant-respondent in Proceeding No. 3.

*Frederick A.O. Schwarz, Jr., Corporation Counsel* (*Morris Einhorn, Leonard Koerner* and *Isaac Salem* of counsel), for respondent in Proceedings Nos. 1, 2 and 4 and respondent-appellant in Proceeding No. 3.

OPINION OF THE COURT

*Per Curiam.*

These appeals concern four consolidated condemnation proceedings in the Supreme Court, Queens County, in which decrees were entered on January 19, 1976, following a joint trial before the late Justice HAROLD TESSLER, and a further hearing before Justice MICHAEL A. CASTALDI, on damages for successive takings of claimants' land in the vicinity of John F. Kennedy Airport.

In Proceeding No. 1, on September 30, 1963, the City of New York (hereinafter the city), acquired title to land for the construction of the Nassau Expressway. Bru-Bar Holding, Inc. (hereinafter Bru-Bar), Seymour Barash and Peter Grimm were awarded $105,621 and two separate $1 awards for land in the bed of a street.

In Proceeding No. 2, the city, on June 29, 1964, acquired title to land for the widening of 135th Avenue. Barash and Grimm were awarded $6,152.

In Proceeding No. 3, the city, on November 1, 1965, acquired permanent easements in connection with the Nassau Expressway. Bru-Bar, Barash and Grimm were awarded $77,270 for damage parcels E 2-16 and $1 for E 1.

In Proceeding No. 4, the city, on October 18, 1968, acquired title to land for a park. Bru-Bar was awarded $133,750.

On December 30, 1968 Bru-Bar assigned its right to awards to its stockholders, Seymour Barash, Peter Grimm and The Cardiff Corporation. Thereafter, in or about January, 1969, the stockholders assigned their rights to the award in Proceeding No. 3 to Wilbur F. Breslin and Robert Frankel.

Notices of appeal were filed as follows: Proceeding No. 1 — appeal by Peter Grimm, Seymour Barash and The Cardiff Corporation; Proceeding No. 2 — appeal by Peter Grimm and Seymour Barash; Proceeding No. 3 — appeal by Bru-Bar and cross appeal by the city; Proceeding No. 4 — appeal by Peter Grimm, Seymour Barash and The Cardiff Corporation.

During the pendency of the appeals, Bru-Bar's appeal and the city's cross appeal in Proceeding No. 3 were withdrawn by those parties, against the protests of the attorneys for Bru-Bar, The Cardiff Corporation, Grimm and Barash. We find, however, that the facts, contentions and issues in that third proceeding are inextricably interwoven with the appeals in the first, second and fourth proceedings. Accordingly, notwithstanding the withdrawal of the appeal and cross appeal from the decree in the third proceeding, we will discuss the facts, contentions, issues and nature of the appeal and cross appeal in that proceeding, in the context of the appeals in the first, second and fourth proceedings.

The appeals before us concern the alleged inadequacy of the amounts of the awards and the failure to grant consequential damages.

In these proceedings claimants sought awards totaling nearly $2,000,000.

In rendering a decision after trial, Special Term (CAS-TALDI, J.), aptly noted that "[t]he many issues involved in these four proceedings and the contentions of the parties with respect to each of the issues verily run the gamut of condemnation law".

*General Issues*

The principal questions presented by the appeals are (1) the weight to be given to, and permissible utilization of, prices paid for land sold at city auction sales, (2) the right to consequential damages for construction by the city of an expressway on an embankment 28 feet above the physical grade at claimants' property, thus allegedly impairing a valuable airport view from the hotel planned for the subject site, (3) the right to consequential damages for alleged deprivation of access to a major road allegedly caused by the taking of a strip of claimants' property for slope easements for the expressway, (4) the propriety of valuing residentially zoned land as if a part of a nearby commercially rezoned parcel on the basis that there was a reasonable possibility that a variance could be obtained for the residentially zoned parcel to permit it to be used for accessory parking for the hotel to be constructed on the commercially rezoned parcel, and (5) the effect on claimants' damage assertions of restrictions imposed by the city in various auction deeds.

*Overview*

In view of the extreme length and complexity of the evidence, issues and briefs, we present the following overview prior to setting forth a more extended statement of the precise principal issues:

These appeals involve the dashed post-World War II hopes of claimant Seymour Barash to assemble and develop a hotel and convention site on approximately 320,000 square feet of vacant land located near the north border of John F. Kennedy Airport. By the end of November, 1961 he had completed the lot assemblage on the main 260,000 square foot parcel (parcel A) and owned a smaller 60,000 square foot parcel (parcel B) nearby to the north, which he planned to use for accessory parking for the parcel A site. Of the 106 lot assemblage constituting parcel A, 48 lots were purchased from private sources. Barash testified that

in November, 1961 he completed the assemblage of parcel A with the purchase at city auction of the remaining lots. Various of the city auction deeds, however, contained provisions and restrictions which the city contends anticipated and precluded, as a matter of law, the type of damage claims made by the claimants arising from the grade of the newly constructed expressway and the taking of the slope easements.

In December, 1962, Barash obtained rezoning of the main site from a residential R 3-2 district to a commercial C 4-2 district except that certain lots in the anticipated right of way of the proposed expressway were left residentially zoned.

In September, 1963, Barash obtained necessary demapping of a key city street on parcel A. Of paramount importance, however, is the fact that he had obtained the interest of a major hotel chain. Having reached this apex, however, he was then confronted with four successive condemnation proceedings, each of which took pieces of the property.

Thus, in 1963 the city took a part of parcel A for construction of the Nassau Expressway, including its service road, North Conduit Avenue, as the latter was relocated and rebuilt north of its original location. The new expressway was thereafter built on an embankment 28 feet above the subject property, thereby allegedly physically placing the property "in a hole" behind a "Chinese wall", and depriving it of a valuable airport view.

In 1964, the city widened the street between parcel A and parcel B, taking a further segment of parcel A.

In 1965, the city took a further slice of parcel A for slope easements for the North Conduit Avenue service road of the expressway. Claimants assert that this deprived the hotel site of access to North Conduit Avenue.

In 1968, the city took parcel B for park purposes. Claimants contend that parcel B could have been and would have been used for accessory parking for the parcel A hotel and that the 1968 taking for a park reduced the size of the overall site holdings to a point below that which was feasible for the proposed hotel project.

Approximately 119,000 square feet had been taken by the four condemnation proceedings. Claimants contend that, in addition to direct and severance damages, they incurred consequential damages from loss of airport view caused by the embankment and the loss of access to North Conduit Avenue. The city contends that claimants incurred and are entitled to direct damages only. Following the 1968 taking of parcel B for a park, the hotel chain withdrew. In 1969 Grimm, Barash and The Cardiff Corporation sold the approximately 233,000 square feet of remaining land to speculators at a price of $10 per square foot.

Special Term determined that the highest and best use of parcel A was for a hotel-convention center complex, but that parcel B must be valued on the basis of the then existing R 3-2 residential zoning. The court awarded direct damages only. It rejected all of claimants' demands for consequential damages caused by the airport-view-impairing embankment and by the alleged loss of access to North Conduit Avenue. The court also rejected claimants' assertion that the residentially zoned parcel B should have been valued on the basis that there was a reasonable probability a variance would have been obtained to permit it to be used for accessory parking for the hotel to be erected on parcel A.

In calculating the direct damages for the 35,207 square feet of parcel A taken in Proceeding No. 1, the court looked to the purchase prices of the 48 parcel A lots purchased from sources other than from the city, derived an average price of approximately $1.87 per square foot for the 48 lots; looked to the purchase prices of the 58 lots purchased from the city at the city auction in November, 1961, apparently averaged those prices at approximately $1.97 per square foot, concluded that the purchase price of the entire 106 parcels, comprising the parcel A assemblage (which 106 parcels were zoned residential at the time of purchase), did not exceed $2 per square foot, allowed a time-trending increment of 10% per year; and, then, after "gearing the property to a C 4-2 commercial zone use for a hotel complex, and mindful that the parcels taken in the 1963 proceeding were part of claimants' overall assemblage",

determined that the fair market value of the 35,207 square feet taken in the 1963 proceeding, as adjusted, was $3 per square foot. Accordingly, an award of $105,621 was rendered therefor, in Proceeding No. 1.

In Proceeding No. 2, involving the 1964 taking for the purpose of widening 135th Avenue, the court awarded direct damages of $6,152 for the 1,893 square feet taken. This award was arrived at by utilizing the $3 per square foot unit price derived by the court for Proceeding No. 1, and adjusting that unit price upward to $3.25 per square foot for the nine-month period between the 1963 title vesting date (September 30, 1963) and the 1964 title vesting date (June 29, 1964).

In Proceeding No. 3 the court awarded $77,270 for direct damages for the acquisition of permanent grading easements covering 21,464 square feet (damage parcels E 2-16). In computing this figure, the court applied to its $3-per-square-foot valuation in Proceeding No. 1 (involving the taking in 1963), a time-trending increment of 10% per annum from September 30, 1963 to the November 1, 1965 title vesting date, resulting in a unit value of $3.60 per square foot for the easement parcels. One dollar was awarded for damage parcel E 1.

In Proceeding No. 4 involving the 1968 taking of the 59,444 square foot parcel B for a park, the court departed from the $3-per-square-foot, parcel A, 1963 valuation base and looked to the evidence of comparable residential sales presented by the parties at a further hearing. Based upon the evidence presented at that hearing, and the court's view of the premises, it arrived at a value of $2.25 per square foot and rendered an award of $133,750.

With respect to the claims of the parties, Special Term's decision states in relevant part:

"Claimants seek both direct and consequential damages. The City denies that claimants sustained any consequential or severance damages. The damages appraised by the claimants and the City as a result of the takings in each of the proceedings are:

|  | | "Claimants | | City |
|---|---|---|---|---|
|  | | "Direct | Consequential | Direct |
| "1963 Taking | | $387,583 | $537,211 | $ 59,550 |
| 1964 Taking | * | | | 2,000 |
| 1965 Taking | | 218,962 | 242,395 | 3,500 |
| 1968 Taking | | 326,942 | 212,673 | 102,500 |
|  | Total | $933,487 | $992,279 | $167,550 |

"*Damage parcels 74 and 75 involved in the 1964 proceeding were valued by claimants' appraiser for both direct and consequential damages in the 1963 proceeding on the theory that the parcels were rendered valueless by the 1963 taking."

Special Term denied consequential and severance damages, and awarded direct damages only. Its awards were in the following amounts:

| 1963 Taking | $105,621 |
|---|---|
| 1964 Taking | $ 6,152 |
| 1965 Taking | $ 77,270 |
| 1968 Taking | $133,750. |

*Specific Issues*

The appeals present the following specific issues:

1. In determining square foot land value in Proceeding No. 1, involving the 1963 taking (and subsequently utilizing that figure, as adjusted, for Proceedings Nos. 2 and 3, involving the 1964 and 1965 takings, respectively), did Special Term err:

(a) in looking to and relying upon the prices paid at public auctions held by the City of New York;

(b) in averaging those auction prices;

(c) in allegedly giving conclusive weight to the average of the auction prices;

(d) in allegedly disregarding claimants' comparable sales, in particular Nos. 2, 14 and 22, which were:

(1) the sale (No. 2) and a resale (No. 14) of a nearby parcel on which a Howard Johnson hotel was ultimately built. Claimants' appraiser reported that the original sale (No. 2) in June, 1961, while the property was zoned R 3-2,

was at $4.55[1] per square foot (82,500 sq. ft.). Claimants' expert answered "Yes" to the question "[a]t the time of sale, was that property purchased with a probability of rezoning?" Although the trial court struck that answer as "speculative", we note that the property was, in fact re-zoned to C 4-2 commercial in 1965 and, in October, 1968, as vacant *commercial* property, sold at $7 per square foot,

(2) the July, 1969, $10-per-square-foot sale (No. 22) to speculators of the land remaining with claimants after the four takings?

2. Did Special Term err in disallowing recovery of conse-quential damages to the land remaining with claimants after Proceeding No. 1 had resulted in the construction of the expressway on a 28-foot-high view-impairing embank-ment?

(a) Were those consequential damages properly disal-lowed because, as held by Special Term, claimants' *evidence* did not sufficiently or properly establish consequen-tial damages arising from the alleged loss of view?

(b) Were the consequential damages for the loss of view barred as a matter of *law* by the provisions in the city auction deeds? (Special Term did not reach this issue.)

3. In Proceeding No. 3, in which the appeal and cross appeal have been withdrawn, the issue was whether Spe-cial Term erred in disallowing consequential damages after the 1965 taking of slope easements for the support of the new North Conduit Avenue had allegedly deprived claimants of access to that road. Claimants contended that the "circuity of access" doctrine (which bars compensation to an abutting owner for municipal highway redesign or relocation where there is other suitable access to that highway), does not apply, and that consequential damages must be awarded where a portion of the abutting owners' land is taken and that latter taking, as distinguished from mere street relocation, deprives the abutting owner of access. On the city's withdrawn cross appeal in Proceeding No. 3, the principal issue was whether the $77,270 award

---

1. In other places in his report and the record, claimants' appraiser also reported the square foot selling price of comparable sale No. 2 as $4.40 and $4.45. He adjusted the $4.55 per square foot selling price of No. 2 in 1961 to the subject, as of the September 30, 1963 vesting date, and proposed a square foot value of $9.78.

in that proceeding (the 1965 taking of slope easements) should be reduced to $26,870 on the basis that restrictions in the deeds to two thirds of the lots comprising the land so taken contain provisions which allegedly precluded such awards?

4. Did Special Term err in rejecting claimants' assertion that in Proceeding No. 4 (involving the 1968 taking of parcel B for park purposes), parcel B, although residentially zoned, should be valued on the basis that there was a reasonable probability that a rezoning variance could be obtained so as to permit parcel B to be utilized for accessory parking to the proposed hotel to be located on the major, commercially rezoned parcel?

*Appeal Perfection Problems: Missing Exhibits*

Prior to a closer and further examination into the evidence, we take note of the many problems afflicting the subject trial and the perfections of the appeals.

The joint trial of these proceedings was held before the late Justice HAROLD TESSLER. The trial transcript consists of over 1,500 pages. Additionally, over 100 exhibits were received in evidence. The death of Justice TESSLER occurred prior to his rendering any posttrial decision. Under the circumstances, the parties stipulated to refer the entire record of the proceedings for decision by Justice MICHAEL A. CASTALDI "based upon all of the evidence and trial minutes submitted plus any additional evidence or hearings as the Court may direct". Thereafter, voluminous briefs were submitted, followed by oral argument.

Prior to rendering his decision, Justice CASTALDI viewed not only all of claimants' property but also viewed the entire surrounding area.

Justice CASTALDI's decision notes: "This is a joint trial of four separate but related condemnation proceedings involving multi-faceted propositions of law requiring a full recitation of the underlying facts".

In seeking to ascertain those facts we have been hindered, however, because not all of the evidence presented to the trial court has been filed with the appendices of the parties. The problems of lost exhibits and the extremely burdensome need to reconstruct exhibits from the testi-

mony is reflected in the following excerpts from the parties' main briefs.

The city's brief states in relevant part: "The facts in this case center around events that occurred 20 years ago when effectuation of plans for extension of both Nassau and Van Wyck expressways in Queens County as an essential adjunct to development of Kennedy Airport were imminent, Nassau Expressway traversing the northerly border of that airport and the subject property abutting the Expressway on its northerly side. The trial commenced 9 years ago in January of 1972 and the final decrees appealed from were entered over 5 years ago in January of 1976 * * * Due to the extraordinary delay in perfecting these appeals essential exhibits, including claimants' appraisal report are no longer available, and such record deficiencies are compounded by critical deletions in claimant's hyphenated 'appendix,' necessitating a second appendix by the City."

Claimants' reply brief answers that:

"While the City correctly states * * * that essential exhibits, including Claimants' appraisal report, are no longer available, yet, at page 35 of its brief [the city] charges Claimants with being responsible for the delay of 5 years after the entry of the final decree in perfecting this appeal, which the City states reflects on the 'merits' of Claimants' appeal. In addition the City charges Claimants [with] the 'deliberate' exclusion of their expert's appraisal * * * from the Appendix. If there is any culpability connected with the delay, it is [sic] City's attorneys who are most culpable, for in most instances it was upon their requests and insistence that the various stipulations of adjournment were signed by both parties.

"With respect to the charge that Claimants deliberately excluded its expert's appraisal from the Appendix, the following are facts: Claimants' counsel had made a diligent search extending over a period of time to find this missing appraisal report, which included examination of the files in the Court Clerk's office, the County Clerk's office, the chambers of the Court below, Mr. Goodman's office [claimants' appraiser], where a search was made of the dead files without success, and the files in Claimants' counsel's own office. Pursuant to the rules of this Court (Sec. 678.1) the

appraisal report was filed with the clerk of the trial Court and a copy served on the Corporation Counsel, whose trial counsel used this report extensively during the trial. Unable to find this report, Claimants' counsel requested of the Assistant Corporation Counsel in charge, to search his files, and he reported that it could not be found. If the City's counsel did have a copy of this appraisal report it should have, but has not included it in its Respondent's Appendix.

"It is inconceivable of what possible advantage there could be to Claimants' cause by the 'deliberate exclusion' from their Appendix of this report, particularly where nearly every facet of this report, the sales and their analysis were testified to by Mr. Goodman in lengthy direct and cross-examination, and where the separate appraisal report of D.P.'s [damage parcels] 159, 190 * * * his list of sales and their analysis, are included in the Appendix."[2]

In view of the age and complexity of this case, the death of the Trial Judge, the missing exhibits, the significance of the issues (so ably presented by the parties), we have determined to reach the merits of the case by reconstructing the missing exhibits from the testimony contained in the appendix.

*The Rise and Fall of the Assemblage and Sale of its Remainder*

We now turn to a closer examination of the evidence pertinent to the issues.

The land under review, located in the South Ozone Park section of Queens, near Kennedy Airport, consisted of two vacant tracts separated by 135th Avenue. At the trial, the larger parcel, which was located south of 135th Avenue and fronted on North Conduit Avenue, was referred to as parcel A. The smaller parcel, which was located on the north side of 135th Avenue, was called parcel B.

Prior to the first taking, the assemblage consisted of approximately 320,000 square feet (parcel A, approximately 260,000 square feet; parcel B, approximately 60,000 square feet).

---

**2.** Claimants' reply brief also notes that: "The Reporter's minutes, pages 414-418 containing Claimants' counsel's voir dire and cross-examination of Mr. Beck could not be found and is [*sic*] not included in either Claimants'-Appellants' or Respondent's Appendix".

Claimant Seymour Barash testified that at the age of 19 in 1945, he recognized the potential of the subject area "for a hotel, office building, convention center complex" because it adjoined Idlewild Airport (now John F. Kennedy Airport) on its northern side between its then two entrances and exits: the Van Wyck Expressway on the west and 150th Street on the east.

He commenced an assemblage in 1947. He testified that by 1959 he had acquired title (through various nominees) to "close to 48" tax delinquent lots in parcel A, at a cost of approximately $270,000.[3]

By 1959, the cost of assembly having used up all of his available money, Barash contacted the Hilton Hotel Corporation. Joseph Binns of that organization told him that "Hilton was definitely interested in acquiring this site" but was not in the real estate business. Accordingly, Binns referred Barash to Peter Grimm, chairman of the board of a prominent real estate firm.

Bru-Bar was formed and Grimm received 50% of the stock in payment of $235,000. Later, claimant The Cardiff Corporation became a stockholder. On completion of the purchase of such additional property as was needed to complete the site, it was to be sold or leased to the Hilton Hotel Corporation. Bru-Bar then proceeded with the acquisition of the balance of the site.

A part of the site was in city ownership. In November, 1961 Bru-Bar purchased from the city at public auctions 58 lots needed to complete the 106 lot, parcel A assemblage. Barash testified that "in November of '61, that is the last purchase. We had the site assembled at that time".

The proposed lines of the Nassau Expressway had been shown on a map, dated February 16, 1960. Those lots within the lines of the proposed expressway, as shown on this map, were excluded from the auction sales held in 1961. Further, in order to insure that the city's 1961 auction sales would not generate or be a source of added expense or added damage claims against the city in the contemplated condemnations, and (as stated by city witness Donato Melaccio) in order that the city would not have

---

**3.** Actually one of the 48 lots (block 12099, lot 6) was not purchased until September 29, 1965.

"to pay through the nose to get the real estate back", various city auction deeds of conveyance contained certain provisions designed for its protection. The text of those provisions is set forth in the decision of Special Term as follows:

"1. That the City of New York and the State of New York shall be saved harmless from any claims by the party of the second part, its successors and assigns, arising out of the grades fixed in the contract plans for the construction of Nassau Expressway and Van Wyck Expressway to Queens County Line, as shown on a map dated February 16, 1960 on file in the office of the Triborough Bridge and Tunnel Authority.

"2. That the City of New York and the State of New York will be permitted to deposit or remove fill from the property in a strip of land 50 feet wide, adjoining the northerly side of the right of way line as shown on the aforesaid map.

"3. That the party of the second part, its successors and assigns, will develop the property in conformity with the grades fixed in the contract plan for the highway project.

"4. That the party of the second part, its successors and assigns, will not be entitled to any claims for consequential damages for future condemnation of the abutting lands as a result of increased plottage."

The deeds also contained this provision: "In the event of the acquisition by the City of New York by condemnation or otherwise of any part or portion of the above premises lying within the bed of any street or avenue, as said street or avenue is shown on the present City Map, the party of the second part, and the heirs or successors and assigns of the party of the second part, shall only be entitled to compensation for such acquisition to the amount of One Dollar and shall not be entitled to any compensation for any buildings or structures erected thereon within the lines of the street or avenue so laid out and acquired. This covenant shall be binding upon and run with the land and shall endure until the City Map is changed so as to eliminate from within the lines of said streets or avenue any part or portion of the premises and no longer."

At this point, we note that among the questions raised on these appeals are:

1. Does clause 1 mean that the February 16, 1960 map said to be on file in the office of the Triborough Bridge and Tunnel Authority, identifies only the *location* of the proposed Nassau Expressway (but not the grades fixed, or to be fixed, in the contract plans), or does that clause purport to state that the grades are as per that February 16, 1960 map?

2. Does the requirement of clause 3 that the property be developed "in conformity with the grades fixed in the contract plans for the highway project" mean that if the February 16, 1960 map shows *no* grades, then the developer does not take subject to the grade of the expressway as *later* constructed, here, on an embankment 28 feet above the subject property?

3. Does the right-to-deposit provision of clause 2 constitute a waiver of damages for the slope easements that were taken by the city in Proceeding No. 3?

4. Does the provision of clause 4, involving waiver of consequential damages for "increased plottage" (resulting from the auction sales), affect claimants' case for consequential damages?

As has been noted, the "save harmless" restriction contained in clause 1 of the auction deeds, refers to grades to be fixed in the *"contract* plans". Edmund Condon, a civil engineer whose firm produced the February 16, 1960 map for the State, testified that the map *could not* contain or establish grades for the proposed Nassau Expressway. Condon and David Kaplan, the director of planning of the Triborough Bridge and Tunnel Authority, testified to the effect that the grades were to be *subsequently* fixed in the *final contract drawings*. The latter were not submitted in final form until *1963*.

Claimant Barash testified that the city's notices and sales booklet preceding the 1961 auction sales put buyers on notice of the deed restrictions, noted *supra*. Barash testified to the effect that prior to the 1961 city auction sales, having noted that the February 16, 1960 map contained no grades, he and his associate, Peter Grimm, visited governmental agents and ascertained that there were no grades shown on the map because the expressway would be constructed at "existing grades".

Having allegedly obtained these assurances, Barash and Bru-Bar, as has been noted, in November, 1961, purchased from the city at public auctions the remaining lots needed to complete the 106 lot, parcel A assemblage. The lots comprising parcel B were acquired in 1960.

Having completed the assemblage, Barash directed his attention to *rezoning* and *demapping*.

Prior to August 22, 1962, the property constituting the entire assemblage (parcel A and parcel B) was zoned R 3-2 residential. On that date, Bru-Bar applied for a rezoning of parcel A to C 4-2 to erect a transient hotel, 14 stories in height, to include about 420 rooms. The application did *not* embrace parcel B. Claimants' brief asserts, that "[s]ince it was believed that Parcel B could be used for accessory parking, as of right, it was deemed not necessary to rezone that portion".

On December 20, 1962, on the application by Bru-Bar, the Board of Estimate of the City of New York rezoned the parcel A property by placing it in a C 4-2 commercial zone.

While a rezoning of the entire area of parcel A was applied for, the rezoning granted excluded the property which by the map of February 16, 1960 might be acquired for the Nassau Expressway.

On application by Bru-Bar the city, on September 26, 1963, demapped 144th Street, an unopened proposed street. Bru-Bar owned the fee title to the bed of that so-called paper street.

The proposed hotel was planned to be erected, in part, in the bed of the mapped but unopened 144th Street. As a condition for such demapping, claimants agreed, *inter alia,* to waive all claims to any awards for the acquisition of over 22,000 square feet of land in a proceeding involving the widening of 135th Avenue, to pay the cost of grading, paving and sidewalks on 135th Avenue, 142nd and 143rd Streets and to construct seepage basins in those streets. Claimants posted a bond of $95,000 guaranteeing the completion of the work. Claimants' counsel estimated the cost of this work along with waiver of an award in the 135th Avenue proceeding at approximately $400,000.

In order to effect his plan for a hotel site, Barash had to: (1) acquire all the needed property, (2) obtain rezoning, and

(3) obtain demapping. Bru-Bar's balance sheet as of December 31, 1963 reported that its "INVESTMENT IN PROPERTY" was $788,774.16. Claimants' expert testified that "approximately 8 or * * * 900,000 dollars" had been expended, and that $39,000 was the price paid for parcel B.

After claimants had thus completed their assemblage and obtained rezoning and the demapping, four condemnation proceedings ensued. As has been noted, each successive proceeding sliced off a part of the assemblage. It will be recalled that the 1963 proceeding took land for the service road of the new expressway.

We take special note of the following facts, stated by Special Term and borne out by the record:

"The title vesting date for the Expressway is September 30, 1963. During the same month of September the grades were established in the contract plans showing the elevations for the construction of the Nassau Expressway.

"Actual start of the construction work for the Expressway was in November, 1965.

"As late as May 5, 1967 a feasibility study prepared by Hilton's Eastern Supervisor detailed the attractive features of an [sic] hotel on claimants' Parcel A".

After each taking, Hilton caused a re-evaluation to be made of the feasibility of the site for the erection of the proposed hotel and caused revised plans for the building to be made. By the last taking in 1968, Hilton could no longer use the site in its then condition, and withdrew.

As has been noted, in December, 1968, the rights to the future condemnation awards were assigned to claimants Barash, Grimm and The Cardiff Corporation, leaving Bru-Bar only one asset, namely, the real property remaining after the four takings.

On July 30, 1969, pursuant to a contract dated January 27, 1969, Barash, Grimm and The Cardiff Corporation sold all their stock in Bru-Bar to speculators Wilbur F. Breslin and Robert Frankel, who thus obtained the land remaining in the assemblage after the four takings. The closing statement reported that the purchase price was computed at $10 per square foot and that a survey conducted for the title company showed that the square footage of the prem-

ises totaled "233,704 square feet". The property acquired by the speculators included the area bordered by the slope easements for North Conduit Avenue. Grimm, Barash and The Cardiff Corporation assigned their right to the condemnation award for the slope easements to Bru-Bar, which was by then owned by the speculators. Although many applications for the release of the slope easements taken by the city were made, at the close of the trial before the late Justice Tessler in April, 1972, they had not been released. Thus the price paid by the speculators was $2,337,040. Grimm, Barash and The Cardiff Corporation received $2,337,040 for the land remaining after the takings, and they and Bru-Bar sought nearly $2,000,000 more, by way of awards in these condemnation proceedings. Were claimants' valuations and theories to prevail to the extent prayed for, a total of more than $4,000,000 would be realized for land which, according to Bru-Bar's balance sheet, cost approximately $800,000, or considerably less, according to the city.

It should be noted, however, that at trial, claimants' counsel argued that had the condemnations not taken place the land in parcels A and B would have sold for far more than $10 per square foot. Furthermore, obligations of $400,000 had been incurred with respect to land given up and obligations had been incurred to obtain the demapping heretofore described. Claimants' appraiser, in fact, testified generally that the Nassau Expressway project had not caused the property to increase in value; it caused a decrease in value.

*Valuations — The Experts Speak*

Prior to presentation and analysis of claimants' arguments, it is necessary to review the square foot valuations of the respective experts and to note the wide range in those valuations between the experts and between claimants and the court.

In Proceeding No. 1, Bernard Goodman, claimants' real estate appraiser, valued the entire assemblage (parcels A and B) on a before and after basis. In his testimony as to "before" value, he treated parcels A and B as having a unity of title and use, the highest and best use of parcel A

being a high-rise hotel, with parcel B for accessory parking.

He valued parcel B, which, having been excluded from the 1963 rezoning, had remained in an R 3-2 zone, as being in a C 4-2 zone, on the basis that but for the contemplated condemnation that property would also have been rezoned to C 4-2.

His before unit value for parcel A was $10 per square foot and for parcel B, $5 per square foot. He valued parcel B, which was in an R 3-2 zone, by discounting his parcel A value by 50% on the basis that an investor in the real estate market, in light of the changing conditions in the surrounding area by reason of its proximity to the airport, would have considered that there was a reasonable probability of a variance for accessory parking.

His after value for parcel A was $8 per square foot and for parcel B, $4 per square foot. He considered that the remaining property suffered a consequential damage of 20% per square foot by reason of the use to which the part taken was put, namely, the erection upon it of an embankment 28 feet above the physical grade of the subject property which cut off the "light, air and the view" of the airport from the "ground floors" or the "first few floors" of the proposed hotel. The before values were derived from his analysis and adjustments of claimants' comparable sales. At the time of the 1963 taking, there were no properties other than parcel A anywhere in the area which were in a C 4 zone. In Goodman's opinion, properties zoned residential were totally incomparable to claimants' C 4-2 commercially zoned property. Most of the sales he listed and adjusted were in an M 1-1 manufacturing zone, because that zone was allegedly closest to a commercial use, since a hotel use is permitted in an M 1-1 zone.

With respect to Proceeding No. 2, concerning the taking for the widening of 135th Avenue, as part of the price for the demapping of 144th Street claimants agreed to waive damages. (But see footnote in Special Term's decision, *supra,* p 8, regarding damage parcels 74 and 75.)

In Proceeding No. 3, involving the slope easements, Goodman continued his unity of title theory and presented

before and after value calculations. He treated the permanent easements to support the service road as a fee taking resulting in direct and consequential damages. His before square foot valuation figures were: parcel A, $9.50 per square foot;[4] parcel B, $4.75 per square foot. His after figures were: parcel A, $8.50 per square foot; parcel B, $4.25 per square foot. Goodman attributed the 1965 drop in value to the consequential damages arising from the loss of the property's access to light and air and loss of access to the newly located North Conduit Avenue, a part of the Nassau Expressway.

As has been noted, in Proceeding No. 4, parcel B was taken in 1968 for park use. Claimants' appraiser considered that parcel B's highest and best use was as accessory parking for the projected hotel to be erected on parcel A. He considered that by reason of its proximity to the airport, the changing uses of the surrounding area and its being serviced by major highways and expressways, a prospective purchaser would pay a premium over and above its residential value on the basis that there was a reasonable probability of a variance. Claimants assert that, by the taking of parcel B and the takings in the three prior proceedings, the area of entire assemblage had been so substantially reduced as to make it unfeasible for use as a hotel. Accordingly, Goodman ascribed a severance damage to the remaining property in parcel A. He valued parcel B conjunctively with parcel A as having a unity of use. His 1968 before unit value of $11 per square foot for the commercially rezoned parcel A was his after value in the 1965 taking, plus a time increment, and his before unit value of the residentially zoned parcel B, based on an investor in the real estate market's consideration of the reasonable probability of a variance, was 50% of his parcel A before unit value, or $5.50 per square foot. His after unit price for parcel A was $10 per square foot. He reported a total damage for the 1968 park taking of $326,942 in direct damages and $212,673 in severance damages. At the further hearing of the 1968 taking, he valued parcel B, overall, at $165,000, computed at $2.75 per square foot.

4. The $9.50-per-square-foot value was derived from the 1963-per-square-foot "after" value of $8, adjusted upward for time.

The city's appraiser, however, valued the various damage parcels separately and found that claimants had incurred direct damages only, and no consequential damages. He made his appraisal on the basis of R 3-2 zoning.[5] His 1963 square foot values generally ran from $2 to $1 depending on location, with a total award of $1 for certain parcels whose deeds limited the award to that sum where the property was in the bed of a street. His total damage conclusion for the four takings was $167,550.

After lengthy trial proceedings, the court:

1. awarded claimants direct damages only, and in amounts far less than those they sought. The court valued the parcel A property which had been taken as follows: $3 per square foot for Proceeding No. 1, $3.25 for Proceeding No. 2, and $3.60 for Proceeding No. 3. It valued parcel B, taken in Proceeding No. 4, at $2.25 per square foot;

2. denied claimants consequential damages arising from the 28-foot embankment;

3. denied claimants consequential damages arising from the alleged loss of access to the new North Conduit Avenue;

4. rejected claimants' contention that parcel B (the park site) should be valued on the basis that there was a reasonable probability a variance could be obtained to permit it to be used for accessory parking in conjunction with parcel A, and directed that the proof of valuation of parcel B "be limited to the issue of valuation for direct damages based on residential use permitted under R 3-2 Zoning, as of the title vesting date, October 18, 1968".

Claimants' points seek to redress this quadruple blow to their case.

The city, of course, opposes any increase in the awards, and on its cross appeal, as noted, it argued that the easement award should be decreased from $77,270 to $26,870.

## THE LEGAL ARGUMENTS

### Direct Damages

Claimants' first argument is that Special Term "adopted an erroneous method in the determination of land values

---

**5.** He would make a "modest change" for the easement portions located in the rezoned area.

in the 1963, 1964 and 1965 proceedings by treating the average of the purchase prices paid by claimants for 58 non-contiguous lots zoned R 3-2 (residential) at public auctions, as conclusive evidence of market value, and in disregard of all claimants' comparable sales".

It will be seen that this argument, as developed by claimants, contains multiple contentions, viz., that in determining its direct damage valuations of only $3 per square foot in Proceeding No. 1 involving the 1963 taking, which was time-trended to $3.25 per square foot for Proceeding No. 2, and to $3.60 per square foot for Proceeding No. 3, the court committed the following principal errors:

1. It *disregarded claimants' comparables,* particularly *No. 2* (the 1961 sale at "$4.55"[6] per square foot of a nearby, residentially zoned, 82,500 square foot, vacant site on which a Howard Johnson hotel was subsequently built), *No. 14* (the 1968 resale at $7 per square foot of the vacant Howard Johnson site after that site had been rezoned to C 4-2 in 1965),[7] and *No. 22* (the 1969 resale at $10 per square foot of the part of the subject property remaining after the four condemnations);

2. It looked to the prices paid at city *auction sales.* Auction sale prices, argue claimants, are in the nature of "panic sales", involve abnormal prices, and are not reflective of fair market value. Further, *neither* expert looked to or relied upon the auction sale prices;

3. In utilizing the auction sale prices, the court *averaged* prices. The prices so averaged were for lots which were not contiguous, which were of different sizes, and which sold at different prices and on different dates;

4. In utilizing the auction sale prices, the court gave *conclusive weight* to those prices. This is alleged to be impermissible where there is other available evidence in the record; and

5. It made an adjustment on a conclusory basis and without record evidence to support it. Claimants refer to the fact that, in adjusting the court's $2 per square foot unit price (allegedly derived from averaging the auction

**6.** See n 1, *supra.*

**7.** Claimants' expert also noted that comparable parcel No. 2 had been sold in 1955 for $46,000, in 1961 for $375,000, and in 1968 (as rezoned to commercial) for $505,000.

prices) to $3 per square foot in Proceeding No. 1, the court's statement of its adjustments included the "conclusory" assertion that it was "gearing the property to a C 4-2 use for an hotel complex".

Let us now examine the merits of these contentions.

Claimants' appraiser testified: "I considered one group of sales for the 1963 and 1965 taking [*sic*]. I considered another group of sales for the 1968 taking and yet I relied interdependently upon all of the sales for various trends and values in the entire area". His written "ANALYSIS OF SALES FOR TITLE VESTING DATE 10/1/63" lists 12 sales, but sale numbers 1, 3, 4 and 5 were an assemblage. The properties involved in those sales were zoned residential and M 1. Sale number 2 was the 1961 sale of the nearby, then residentially zoned, future site of the Howard Johnson hotel. Sale numbers 6, 7 and 8 involved property zoned M 1. The "ANALYSIS" expressly states: "Sales 9 & 10 Not Comparable". Sale numbers 11 and 12 also involved properties zoned M 1.

Mr. Goodman (claimants' expert) testified to the effect that, at the time of the 1963 taking, there were no properties zoned C 4 anywhere in the area, the nearest being one in Rochedale Village and the other on Liberty Avenue, Jamaica. In his opinion, properties zoned residential were totally incomparable to claimants' commercially zoned parcel A. He listed M 1 zoned comparables because M 1 zoning permits hotel development.

We note however, that he *further* testified that C 4 permits a floor area ratio of 3.4 times as many square feet as M 1 and that M 1 permits manufacturing uses, i.e., uses inharmonious to hotel development.

We note further that his "TOTAL" (compound) adjustments of comparable sale numbers 1 through 12 ranged from 215% to 262% — all upward, of course. The "TOTAL" adjustments to sale numbers 6, 7 and 8 (all zoned M 1) were each 262%. The adjustment to sale number 11 (zoned M 1) was 262%. He conceded, however, that "[t]he more adjustments you make, obviously, the less probative that sale is for value".

Goodman further conceded that he could not use the sale of any R 3-2 zoned property as a comparable because it

"couldn't possibly be adjusted, there would be such a tremendous adjustment to that sale to absolutely reject the approach". He further conceded that he had to make "tremendous adjustments" on the sales he had used and had to make a "multitude of adjustments" on his comparables "from 1963 through the last vesting of '68". He further said that "I had to make do with what I have [*sic*]", and that "[i]t is the best I could do". He stated that "fortunately [he] did have an actual sales price". "[H]ow accurate [his comparables] are" asserted Goodman, "is measured perhaps and ultimately so by the eventual sale [price] of the property [in 1969]. At least I have it as a guide and I know I can't be that cockeyed". He added that "I have one other sale, the only other sale of C-4 land was to the west in a less desirable area", namely, the site on which the Howard Johnson hotel was to be built.

Thus, the extreme weaknesses in claimants' listed comparables is manifest and was virtually conceded by claimants' appraiser.

We further note that at this 1972 trial, the 1969, $10-per-square-foot resale of the remainder of parcel A was not even listed on claimants' appraiser's document entitled "ANALYSIS OF SALES FOR TITLE VESTING DATE 10/1/63", which document was used for both Proceedings Nos. 1 and 3. The unlisted $10-per-square-foot 1969 resale was merely used, admitted Goodman, as a "guide" against being "cockeyed" and, as noted, it was made to speculators.

While the $4.55-per-square-foot, 1961 sale number 2 of the then residentially zoned vacant site of the future Howard Johnson hotel might, if reasonably adjusted, have provided some indication of the value of the subject property for Proceeding No. 1, to derive his value as of the vesting date, claimants' appraiser adjusted that selling price upward from $4.55 per square foot to $9.78, a 215% total adjustment.

Special Term appears to have concluded that sale number 2 might be considered a comparable, but it does not appear to have given weight to that sale or to have specifically explained why it did not do so.

As has been noted, however, although Goodman had testified that "[t]he more adjustments you make, obvi-

ously, the less probative that sale is for value", he found it necessary to make a 215% upward adjustment ($4.55 to $9.78) to relate sale number 2 to the property which was the subject of Proceeding No. 1. Further his analysis shows that sale number 2, which took place in 1961, was from "Conduit Molding Co." to "North Conduit Corp.", but, insofar as appears from this record, the seller's title was not based on auction sales in which deeds of conveyance contained value-depressing restrictions of the nature contained in the auction deeds by which Bru-Bar obtained title from the city. Since Goodman's list of comparables disintegrated into one possible comparable (sale number 2), its 1968 resale (sale number 14) as a C 4 commercially zoned property, and the sale (sale number 22) of the remainder of the subject property in 1969 (i.e., a considerable number of years after the 1963, 1964 and 1965 vesting dates) to speculators, the court was given strong evidentiary justification for totally disregarding *claimants'* comparables. The court also rejected the *city's* comparables, and, on these appeals, claimants, of course, make no contention that the court should have looked to the city's comparable sales. Under the circumstances, the court, faced with a lack of satisfactory valuation evidence from the respective experts, after a lengthy, complex trial, turned understandably to the actual purchase prices of the 106 parcels, particularly the 1961 auction sale prices (i.e., it turned to actual sales of parcels of the subject property in its preassemblage, precommercially zoned status), and made upward adjustments to derive their value for the takings in issue.

■ With the exception of the total failure to give any weight whatsoever to sale number 2 and the modification we would make therefor, discussed below, the court's judgment here cannot be faulted. The degree of comparability is a question of fact (*Freiberger v State of New York,* 33 AD2d 619). In *Matter of City of Rochester v BSF Realty* (59 AD2d 1035, 1035-1036), the Appellate Division, Fourth Department, correctly stated: "The suitability of comparable sales, absent legal error (*Argersinger v State of New York,* 32 AD2d 708, 709), is a matter for resolution by the trial court (*Yonkers Realty Assoc. v State of New York,* 52

AD2d 1014, 1015; *Sapia v State of New York,* 33 AD2d 821). Here the amount of the award demonstrates that the testimony of the city's expert was at least partially discounted. We do not find that the court's approach represents an abuse of its discretion (cf. *Levin v State of New York,* 13 NY2d 87, 92-93)".

## Use of Auction Sale Prices

Claimants cite *Matter of Board of Water Supply* (277 NY 452, 458-459) for the proposition that: " 'Fair market value' means neither panic value, *auction value,* speculative value, nor a value fixed by depressed or inflated prices" (emphasis supplied). However, in the case at bar, city witness Donato Melaccio testified that every city-owned parcel must be appraised at its market value in fixing its minimum or "upset" price for sale, that the public sales are heavily advertised, and that sales prices in the subject area generally exceeded the upset price by a very substantial margin due to competitive bidding, despite the fact that a limited fee was being sold along the right-of-way line of the expressway subject to grade changes, slope easements, etc.

Claimant Barash testified that at one of the auction sales, the city had set an upset price of about $70,000. There was "very heavy bidding", and the sale price was over $200,000. Claimant Bru-Bar purchased 58 auction sale lots to complete its assemblage of 106 lots.

Under all of these circumstances, we conclude that the auction sales were not of a "panic" or "distress" sale nature and that, on the facts at bar, they were not so abnormal in nature as to preclude their use or to minimize their weight.

## Averaging of the Auction Sale Prices

In contending that it was error for the court, in utilizing the auction prices paid for the 58 lots in parcel A at the city auctions to average those prices, claimants assert: "These 58 lots were sold at 7 separate sales and conveyed by 7 separate deeds. 35 lots were conveyed by 4 separate deeds on November 8, 1961 and 23 lots were conveyed by 3 separate deeds on November 9, 1961 (City's Exh. 48). The sales were of non-contiguous lots, of varying sizes, at different locations and each at a totally different unit price from the other. By way of illustration, in the November 8, 1961 deeds, one sale was of a single lot, Block 12099 lot 15,

a long narrow lot with a frontage of 11.64 feet on North Conduit Avenue running back to a frontage of 33.85 feet on 135th Avenue, with depths ranging from 160.94 to 276 feet. It contained an area of about 7130 square feet [and] sold for $10,000 or about $1.40 per square foot. A series of other lots in Block 12098 sold for $2.42 per square foot, and another series of lots in Block 12096 sold for $2.90 per square foot. Thus in the November 8th deeds the range of prices were [*sic*] from $.140 to $2.90 per square foot".

Citing *Latham Holding Co. v State of New York* (16 NY2d 41), claimants argue that "[i]t is an erroneous method of arriving at value by averaging various sales at widely different sales prices". Claimants rely on the following language from the *Latham Holding Co.* case (p 47): "If this method of averaging front footages were legally admissible, it would mean that every parcel of land fronting upon Route 7 in this entire area was worth $250 per front foot, which would be a legally erroneous method of arriving at values as demonstrated by the sales of these various parcels themselves at widely different figures. If Mr. Babbitt's method were correct, they should all have sold at or about the same value per front foot."

We find, however, that the parcel prices "averaged" in the *Latham Holding Co. (supra)* case were disparate from and unconnected with the subject therein, whereas, at bar, the subject averaged parcels were purchased to be part of an assemblage for a hotel and convention site. The one-day disparity in the dates of the auction deeds, of course, is inconsequential. Examination of the maps showing the locations of the subject auction lots demonstrates that, as would be expected, the lots were either contiguous to or so close to each other as to make them suitable for the hotel assembly, whether for the hotel site proper, or to protect that site from competition, or to augment the operations of the hotel, or to advertise the hotel itself. Further, it is apparent that while various lots, taken in Proceeding No. 1, and fronting on the old North Conduit Avenue, were separated from the hotel site proper (which would be on the land immediately north of the new North Conduit Avenue) by lots retained by and in the ownership of the city, those city lots were kept off the auction block because of the

anticipated condemnation. It is manifest that, had they also been auctioned off, claimants would have sought to purchase them. In short, unlike *Latham Holding Co. (supra)*, the alleged, disparate lots at bar were, in fact, part of the same body, a body whose skeletal system was the hotel site and whose pulsebeat was Barash's driving motive to assemble.[8]

In the *Latham Holding Co. (supra)* case there was neither the skeletal system of comparable lots assembled for a unified, compact, single-use site nor the unifying force of an assemblor's driving motive to put together a site suitable for a single type of business.

*The "Conclusive" Weight Allegedly Given to the Auction Sale Prices*

Claimants contend: "While the Court below [sic] cited *Matter of City of New York (Marshall)*, 16 A.D.2d 570, 576, 299 NYS 2d 947, 954, for the proposition that an auction price is *not* conclusive of market value, but may be accorded some weight * * * the Court nevertheless used these auction prices as conclusive evidence of the market value of claimants [sic] property. The holding in that case was not, as the Court below [sic] stated, that an auction price may be accorded some weight, but held [sic] that *only* in the absence of proof concerning particular sales 'that auction sales are not entirely without recognition of true market value'. In the instant case claimants had submitted proof of a number of 'particular sales'. Neither the claimants' nor the City's appraiser in the instant case placed any reliance on these auction prices as indicating market value".

It is manifest, however, that, as noted, claimants' comparables virtually disintegrated before the court's eyes. It was obligated to find values for the 1963, 1964 and 1965 vesting dates. With respect to sale number 14 (the 1968 resale of the commercially rezoned future Howard Johnson hotel site) and sale number 22 (the 1969 sale to speculators of the remainder of parcel A), the court held that they "were not made within a reasonable time after title vesting", and therefore "are not a true barometer of market

8. Claimants' appraiser testified that "these contiguous frontages along North Conduit [Avenue] were treated as part of the major assembly". He valued them "at the same assemblage value".

value of the subject parcels in 1963" (and, presumptively, for the 1964 and 1965 takings, because of the adjustments that would be necessitated).

This was clearly within the fact-finding and discretionary authority of the court. The court then turned for evidentiary assistance to the city's comparables. It found them also wanting (as did claimants' appraiser), and rejected them. Facing an evidentiary valuation void after a protracted complex trial, following which the Trial Judge had died, Justice CASTALDI then decided to utilize *actual* prices paid for the parcel A lots purchased at auction by claimants. In doing so, he made adjustments for the fact that they were essentially in their preassemblage form, purchased before the subject vesting dates and were residentially zoned when purchased. If fairly so adjusted, the auction sale prices on the particular facts of this case were reliable, probative evidence.

An "actual sale of the subject property at arm's length is of course the very best evidence, because directly reflective of market value, if recent in time, and not explained away as abnormal in any fashion" (*Matter of Lane Bryant, Inc. v Tax Comm.*, 21 AD2d 669, 670, affd 19 NY2d 715).

Under the circumstances, we find no error with respect to the *weight* given to the auction sale prices, except that some consideration should have also been given to sale number 2, as will be noted and calculated below.[9]

*The Gearing Adjustment*

We find no merit to claimants' contention that the court's residential to commercial adjustment of the average of auction sale prices was not based on evidence. After concluding in Proceeding No. 1 that the indicated purchase price of the entire 106 lots comprising parcel A did not exceed $2 per square foot, the court made a time-trending adjustment of 10% per year from the November, 1961 auction purchase dates to the September, 1963 vesting date. This would bring the $2 figure to approximately $2.40. The court then adjusted its value up to $3 per square foot after "gearing the property to C 4-2 use for an hotel complex, and mindful that the parcels taken in the 1963

---

**9.** The property concerned in comparable sale number 2, was located approximately two blocks west of the subject property and became the site of a Howard Johnson hotel.

proceeding [No 1] were part of claimants' overall assemblage". We note that the difference between $2.40 and $3 is 60 cents. The latter is 25% of $2.40. At the trial, claimants' expert appraiser testified that he made a 25% upward adjustment to claimants' residentially zoned comparable sale number 2 to reflect the commercially rezoned nature of the subject property, stating:

"Q Tell us about sale number 2, what was the zoning when it was first purchased.

"A A residence.

"Q When was this?

"A June of 1961.

"Q Did you make an allocation of the difference by reason of the zoning between sale number 2 and the subject property?

"A Yes sir, I did.

"Q And that allocation is how much?

"A 25 percent."

Thus, the court's "gearing" adjustment was clearly supported by and based upon claimants' own evidence.

In conclusion we find no ground to disturb the court's direct damage awards for takings of parts of parcel A in Proceedings Nos. 1 and 2, except that we would make upward modifications to give some weight to sale number 2, which took place in 1961, of property located approximately two blocks west of the subject property.

*Modifications of Awards*

Notwithstanding the striking of the opinion given by claimants' appraiser that the 1961, $4.55-per-square-foot sales price of the residentially zoned comparable sale number 2 (the future site of the Howard Johnson hotel) was based upon a reasonable probability that it would be rezoned to commercial, the over-all evidence does, in fact, establish that there was such a probability in 1961, a probability which was realized in 1965 by official rezoning to commercial. As so rezoned, the property which was the subject of sale number 2 sold in 1968 at $7 per square foot. Under the circumstances, and notwithstanding the excessive 215% compound adjustment to sale number 2 made by

claimants' appraiser (resulting in the $4.55-per-square-foot sale price being adjusted upwards to $9.78), we find that the constitutional mandate of just compensation would be flouted were sale number 2 to be totally ignored in the valuation process, particularly in view of the following decisional conclusion made (but not utilized) by Special Term: "By reason of the acknowledged dissimilarities, the court holds that claimants' sales (*except No. 2*) may not be considered as comparables and they do not aid the court in establishing market value for the subject parcels" (emphasis added).

Accordingly, we adopt some and modify others of claimants' adjustments to sale number 2, as follows:

|  | Claimants |  | This court: |
|---|---|---|---|
| Time | 1.25 |  | 1.25 |
| Zoning | 1.25 |  | 1.1 (the probability of rezoning having already largely been taken into consideration in the $4.55 square foot sales price) |
| Size | 1.25 |  | 1.15 |
| Topography | 1.0 |  | 1.0 |
| Location | 1.1 |  | 1.1 |
| Total | 2.15 | [*sic*, 2.14] | 1.73. |

Applying our various adjustments we adjust the $4.55-per-square-foot, 1961 price of sale number 2 to $7.87 per square foot. The $3-per-square-foot valuation of Special Term being derived from a multitude of actual sales of lots which are a part of the *subject* assemblage, we give great weight to that figure but also some consideration to sale 2 as adjusted by this court. We weigh the $3 and $7.87 valuations on a 2 for 1 ratio, respectively, and reach a $4.62-per-square-foot valuation of parcel A for the 1963 taking. Applying the general pattern of time adjustments utilized by the trial court, we find a per-square-foot valuation of $4.96 for the 1964 taking.[10]

---

10. We note that at bar claimants' appraiser, in processing his adjustment, utilized a compounding technique and not an addition technique. The two methods are discussed in the decision of the trial court in *Matter of Town of Hempstead (Malibu Assoc.)* (Supreme Ct, Nassau County, Sept. 27, 1978, MEADE, J., revd on other grounds 81 AD2d 591, revd 56 NY2d 1020, on remittitur 97 AD2d 477). In adopting the addition technique utilized therein by petitioner's appraiser rather than the compounding method used by St. Aubin's appraiser, the trial court stated, in *Matter of Town of Hempstead (Malibu Assoc.)* (*supra*): "In the mathematical processing of adjustments, the petitioner's ap-

In Proceeding No. 1, Special Term having awarded $105,621 for the 35,207 square feet of parcel A taken in 1963, we increase that award to $162,656.34 ($4.62 x 35,207).

In Proceeding No. 2, Special Term having awarded $6,152 for the 1,893 square feet taken in 1964, we increase that award to $9,389.28 ($4.96 x 1,893).

## Consequential Damages Attributable to the Embankment

Claimants' second point is that the trial court erred "in disallowing consequential damage to claimants' remaining vacant land by reason of an embankment erected in [sic] the property acquired in the 1963 proceeding along its frontage on North Conduit Avenue, resulting in a loss of view of the surrounding area and of the Airport".

---

praiser employs a basic method of addition whereby the percentages representing his estimates of the separate adjustments are added and the resulting composite sum multiplied by the actual sales price per acre to arrive at the adjusted sales price per acre. St. Aubin's appraiser multiplied his actual sales price by an adjustment factor (percentage) resulting in an adjusted sales price, which is then multiplied by the second adjustment factor, resulting in a new adjusted sales price. This method is continued until all factors are reflected in a final adjusted sales price. Since the factors employed to reflect the separate units of adjustment are substantial in this proceeding, the method utilized by St. Aubin is compounding in nature and tends to inflate the final adjusted sales price. The Court adopts the adjustment process utilized by petitioner".

At bar, neither the evidence nor the arguments require us to pass upon the merits of either technique. Accordingly, we do not adjudicate the question even though in making the valuation modifications set forth — the foundation of which is giving some weight, even if minimal, to only one of claimants' comparable sales — we utilize the same arithmetical adjustment technique used by claimants' appraiser. Consistency appears to require — on the facts of this case — that we stay within the mathematical framework of that expert's technique when we modify (with respect to one comparable) the adjustments made by him.

We note that in giving some consideration to claimants' comparable sale number 2 to increase specified awards we have averaged sale number 2 (as modified by this court) with the valuation (as adjusted) derived by Special Term from an *averaging* of auction prices. An impartial observer might argue that it was impermissible to utilize the averaging process (*Latham Holding Co. v State of New York,* 16 NY2d 41) and that our process suffers from the further defect of averaging sale number 2 with a figure that is *already* derived from an average. We would note, however, that the *city* argues in *support* of Special Term's utilization of the average-derived auction price valuation and *claimants* cannot readily argue *against* utilization of sale number 2. More significant, however, is (1) the justification set forth at bar by Special Term and this court for utilizing the auction prices (*actual* sales prices of parcels *unified* by being part of an assemblage) (cf. *Latham Holding Co. v State of New York,* 16 NY2d 41, *supra*); (2) sale number 2 was approximately only two blocks away and also facing the embankment (cf. *Latham Holding Co. v State of New York, supra*); and (3) any weaknesses in comparable sale number 2 or the compounding adjustment technique have been compensated for by our reductions in claimants' adjustments of comparable sale number 2 and our weighting technique. As noted by the Court of Appeals (in a tax certiorari context): "Pragmatism, however, requires adjustment when the economic realities prevent placing the properties in neat logical valuation boxes" (*G.R.F., Inc. v Board of Assessors,* 41 NY2d 512, 515). At bar we might add to *G.R.F.*'s "economic realities" the words "and the mandate that just compensation be awarded".

In support of their second point, claimants contend that: "it would be contrary to law for them to submit proof, which the Court below [sic] held that claimants failed to, but should have, of the loss in the value of the vacant land by reason of the loss in value of the first two floors of a projected hypothetical building, the only part of the hypothetical building which the Court held would suffer a loss of view; that the Court erred in holding that it was 'completely arbitrary' to show the difference in the value of the land before and after the erection of the embankment, and in holding, contrary to the proof, that claimants knew back to 1963 of the elevations of the proposed Expressway or should have known about these elevations, and by reason thereof, that claimants were not entitled [to] the consequential damage to the land for loss of view."

As has been noted, in Proceeding No. 1 claimants' expert attributed before per-square-foot values of $10 to parcel A and $5 to parcel B and attributed after per-square-foot values of $8 to parcel A and $4 to parcel B. He considered that, after the taking, the remaining property had thus suffered consequential damages of 20% by reason of the use to which the part taken was put, the erection upon it of an embankment running from 32 to 28 feet above the subject property, which cut off the "light and air and the view [from] the ground floors" of the proposed hotel of the surrounding area and of the airport. However, although claimants' appraiser testified that the embankment placed the subject property in "a hole, that there would have been excessive or additional cost of a foundation or construction to bring the property to a usable site, either fill or engineering or construction", there was no engineering or dollars-and-cents cost data or other competent testimony to support this conclusion. For example, the dollar cost of fill or of a special foundation divided by the total square feet of the "before" area might have provided objective evidence of the alleged "gut feeling" consequential damages.[11]

Thus, claimants' appraiser's estimate of 20% consequential damage for the loss of view from the first few floors of

---

**11.** Cf. *Arlen of Nanuet v State of New York* (26 NY2d 346, 351) holding that it was not permissible: "to fix the market value of land, completely bare when condemned, solely on the basis of capitalization of income expected to be realized from buildings and other extensive improvements not yet financed, on which no work had even been begun on the day of taking."

the proposed hotel was concededly based upon his "own general gut feeling as a real estate man". He also stated:

"And I say that a loss of view and the problems with the grading and the problems with the foundation, the problems with the additional construction costs, all of these things I have considered and in my opinion I have ascribed 20 percent damage for the consequential damages that occurred because of the taking * * *

"There were no comparable sales, I had no engineering that was available because I would have to know pretty much specifically the type of structure that would be involved for me to get involved with engineering. So it is just an *educated guess*" (emphasis supplied).

■ We also note that the consequential damage conclusions were based on mere plans or design schemes and not on an actual structure, and that no application had ever been filed to build a hotel. While the land could not readily be changed, the plans could. In this connection, we note that the Howard Johnson hotel, constructed in 1969, on the site of claimants' comparable sale number 2, also faces the embankment.[12] Various photographs in evidence seem to indicate that the Howard Johnson hotel was built on a type of platform, with the guest rooms above the platform and other spaces below the platform. The parking for that hotel is on-site, basement parking, and yet the hotel was built on a site smaller than that of claimants. On all of the evidence, we find that claimants' evidence did not adequately, sufficiently, and competently establish the claimed consequential damages.

Having determined that claimants' evidence did not establish embankment-caused consequential damages, Special Term did not reach the issue of whether, as a *matter of law,* various restrictions in the auction deeds precluded this claim. We reach the issue, however, and find that the evidence overwhelmingly and properly established that it was the intent of the auction deed restrictions to preclude the very type of embankment-caused, conse-

**12.** Claimants' appraiser testified that the height of the Nassau Expressway as it goes by the Howard Johnson hotel is "[r]easonably at the same height" as the expressway in the vicinity of the subject property.

quential damage claim asserted by claimants. Notwithstanding claimants' contention that the restrictions are ambiguous and that ambiguous phraseology should be interpreted against the drafter, it would seem clear that the manifest intent of clauses 1 and 3 in the deeds, the text of which has been set forth, *supra,* is that the location of the proposed Nassau Expressway was "as shown on a map dated February 16, 1960 on file in the office of the Triborough Bridge and Tunnel Authority". However, the grades, as has been noted, were to be those "fixed in the contract plan", which plan at the time of claimants' alleged pre-1961 auction sale inquiries, had not been finalized. The issue is not one of contract ambiguity but of fact ascertainment as evidenced by Barash's conclusion that the subject provision required him to seek further information prior to the auction sales.

As we have also noted above, Barash testified on direct examination that the city's notices and sales booklet preceding the 1961 auction sales placed buyers on notice of the deed restrictions. Prior to the auction sales he and Grimm went to the office of Mr. Robert Moses at the Triborough Bridge and Tunnel Authority to look at the map of February 16, 1960. Upon seeing the map, he inquired further "because there were no grades shown on the map at all". Barash was asked and testified:

"Q Did you ask at that time at Triborough Bridge and Tunnel Authority as to the grades with respect to that map?

"A I certainly did. I noted that there were no grades shown on the map and I asked if there were any other maps and I was advised there were none and I asked what about this clause. I was advised since there are none it would be the same, if there were new ones it would be indicated thereon. And I left that day that there were no grades and elevation, I wasn't bound by anything."

It will be noted that Barash's direct testimony, *supra,* does not specify who "advised" him. On cross-examination, however, he testified, as follows:

"THE WITNESS: Mr. Grimm and I went to Mr. Moses' office and I discussed it with the lady that gave me the map.

"Q What specifically did you discuss with reference to that condition number one?

"A The fact that the map did not show any grades.

"Q What were you told by Mr. Moses?

"A I didn't speak to Mr. Moses about it, Mr. Grimm spoke to Mr. Moses. I was told that there were no grades for this job because the job would be the existing grades. And if they intended to change the grades they would have listed it and that is why there was no grade change there, they were going to be existing ones."

We note, however, that Grimm did not testify, that Barash's testimony as to the late Mr. Moses would appear to be pure hearsay and Barash's conversation was merely with an unidentified "lady". This problematic, weak testimony is totally insufficient to overcome the overwhelming evidence that the grades were to be fixed, not on the February 16, 1960 map, but on the contract plans which had not been developed and finalized at the time of the 1961 auction sales.

*Parcel B Award — Proceeding No. 4*

Claimants' fourth point is that the trial court "erred in holding, contrary to law, that since claimants failed to prove the reasonable probability of their obtaining a variance from the Board of Standards and Appeals, that therefore Parcel B must be valued R 3-2 and erred in directing the parties to submit further proof limited to direct damage and to residential use".

At the trial, attorney Leonard F. Rothkrug, an expert in zoning and administrative law within the City of New York, testified on behalf of claimants that they would have been able to obtain a variance permitting them to utilize parcel B (zoned R 3-2) for accessory parking for the proposed hotel on parcel A (which had been rezoned C 4-2). His method and rationale were, in effect, as follows:

1. Community facilities, such as synagogues, churches, wedding chapels, community meeting rooms, hospitals, senior citizens' homes, etc., are permitted in residential zones, and are commonly granted accessory parking variances in those zones;

2. Claimants would set apart on the parcel A hotel site a certain area for a wedding chapel as part of a catering facility that the hotel would maintain and would also set aside certain public rooms in the hotel for community use as meeting rooms;

3. The city Department of Buildings would then have to grant claimants, "as a matter of right", off-site parcel B parking for the parcel A community facility;

4. Were the Department of Buildings to deny the application for off-site parking on the R 3-2 zoned parcel B, though rezoning of parcel B to C 4-2 could not be obtained from the City Planning Commission, the Board of Standards and Appeals would grant an application for a variance to permit such off-site parking for the community facility. Rothkrug claimed to have had a better than 90% success rate of applications for such variances. The only problems he had encountered dealt not with the variance itself but with the conditions imposed by the Board of Standards and Appeals (buffering, landscaping, etc.). He conceded that the parcel B site is in a "primarily residential" area but contended that with appropriate buffering and safeguards for the residents, the variance would be granted; and

5. A parcel B off-site parking facility for the community facility placed on the parcel A hotel site could then be used for "permitted parking" for the hotel, over and above the mandatory minimum parking facilities required to meet the zoning resolutions with respect to the parcel A hotel site. Subsequent expansion of the off-site parking variance for the community facility to permit such "strictly hotel use", i.e., general accessory parking use on parcel B, would have a "very good chance of success".

However, Nathan Ginsberg, an engineer and city planning consultant, who, prior to 1966, had served the city, the City Planning Commission and the Board of Estimate "in matters of mapping and zoning" for over 40 years, testified to the effect that only a misreading of the city's zoning resolution could warrant the conclusion that a special permit or variance could be obtained to use the residentially zoned R 3-2 parcel B as accessory parking for the adjacent commercially zoned, C 4-2 parcel A. He

pointed out that section 36.43 of the city's zoning resolution permits such accessory parking on adjoining land zoned for commercial or manufacturing use, but not on adjoining land zoned for residential use — regardless of whether a wedding chapel, catering hall or community center is built on C 4-2 land. Ginsberg, further, testified that there was adequate room for parking on parcel A, stating "if this [hotel had] 400 rooms, the required parking would be 50 cars * * * [a]nd that could be either open or garaged". Further, Ginsberg noted the development surrounding parcel B (taken for a park herein) and stated that "it would be an inappropriate place for an in and out parking facility accessory to something that was in a C-4 district". He concluded that it was unlikely that the Board of Standards and Appeals would grant a variance.

Claimants contend that the trial court erred: "in holding that claimants had the burden of proving, which they did not sustain, that there was a reasonable probability that on their application to the Board of Standards and Appeals that a variance would be granted, and in holding that it was unlikely in that event, that the Board of Standards and Appeals would grant a variance. Claimants have no such burden. The test is *not* whether the Board on claimants' application would grant such a variance, but whether a prospective purchaser would consider in view of the unprecedented changes in the neighborhood by reason of the proximity to the Airport that there was a probability of such a variance, and because of the uncertainty, would pay a premium for such a probability in addition to what the property is worth under existing restrictions. Claimants further contend that the Court erred in directing proof limited to only direct damage and to residential use".

■ We find no merit to claimants' fourth point.

First, claimants had envisioned a hotel of about 400 to 420 rooms according to their appraisal expert. The minimum number of parking spaces needed for a 400 room hotel was 50. City exhibit 64 (the Kornblath plan) was a basement floor plan made in 1962 and submitted by claimants to the Borough President of Queens in connection with the rezoning application. It showed that parking

would be provided on the site (parcel A) and envisioned parking for *325* cars.

Second, claimants' application for rezoning from residential (R 3-2) to commercial (C 4-2) sought such rezoning for parcel A but not for parcel B.

Third, the evidence on the issue of whether the Board of Standards and Appeals would grant the variance for off-site parking was sharply conflicting. Claimants did not sustain their burden of proof on that issue.

Fourth, claimants' argument, that the standard is not whether the board would grant a variance but whether a potential purchaser would pay an increment in value for that probability, fails because the probability is based upon a Trojan Horse technique. Clearly, this foot-in-the door — in the *back* door — technique for obtaining off-site parking for the hotel, is not such as to inspire such confidence in a buyer as to encourage him to part with additional moneys on the probability that a variance could be obtained for off-site parking on parcel B for general hotel use.

*Conclusion*

Accordingly, the decrees in Proceedings Nos. 1 and 2 are modified to the extent set forth herein. As so modified they are affirmed. The appeal and cross appeal in the Proceeding No. 3 are deemed withdrawn. The decree in Proceeding No. 4 is affirmed.

One bill of costs is awarded to the appellants Barash, Grimm and The Cardiff Corporation payable by the City of New York.

DAMIANI, J. P., GIBBONS, O'CONNOR and BOYERS, JJ., concur.

In Proceeding No. 1, ninth separate and final decree of the Supreme Court, Queens County, dated January 19, 1976, modified, on the law and the facts, by increasing the sum awarded therein for damage parcels 121, 124, 126, 130, 131, 137, 139, 142-145, 147-153, 159 and 160 to $162,656.34. As so modified, ninth separate and final decree affirmed.

In Proceeding No. 2, amended final decree of the Supreme Court, Queens County, dated January 19, 1976, modified, on the law and the facts, by increasing the sum

awarded therein to $9,389.28. As so modified, amended final decree affirmed.

In Proceeding No. 3, upon stipulation of Bru-Bar Holding, Inc., and the City of New York, appeal and cross appeal from final decree of the Supreme Court, Queens County, dated January 19, 1976, deemed withdrawn.

In Proceeding No. 4, final decree of the Supreme Court, Queens County, dated January 19, 1976, affirmed.

Claimants Grimm, Barash and The Cardiff Corporation are awarded one bill of costs payable by the City of New York.